Arnold M. Willig
Elizabeth H. Shea
Charles L. Butler, III
HACKER & WILLIG, INC., P.S.
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Hope S. Foster
Tracy A. Miner
Laurence J. Freedman
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
701 Pennsylvania Ave. NW, Suite 900
Washington, DC 20004
Telephone (202) 661-8758

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WASHINGTON, AT SEATTLE

| | |
|---|---|
| In re:<br><br>NATURAL MOLECULAR TESTING CORPORATION,<br><br>        Debtor. | Bankr. Case No. 13-19298-MLB |
| NATURAL MOLECULAR TESTING CORPORATION, a Washington corporation,<br><br>        Plaintiff,<br><br>        v.<br><br>CENTERS FOR MEDICARE & MEDICAID SERVICES; MARILYN TAVENNER, in her capacity as Administrator of the Centers for Medicare & | Adv. Case No. 13-01635-MLB<br><br>*AMENDED* COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY OF THE ESTATE, INJUNCTIVE RELIEF, DAMAGES, OBJECTION TO CLAIMS FILED IN BANKRUPTCY, ACCOUNT STATED, QUANTUM MERUIT, AND UNJUST |

*AMENDED* COMPLAINT FOR DECLARATORY RELIEF,
STAY VIOLATION, RECOVERY OF PROPERTY,
INJUNCTIVE RELIEF, DAMAGES, ETC. - 1

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Case 13-01635-MLB    Doc 55    Filed 06/27/14    Ent. 06/27/14 09:45:10    Pg. 1 of 31

| | | |
|---|---|---|
| 1 | Medicaid Services; NORIDIAN HEALTHCARE SOLUTIONS, LLC; and KATHLEEN SEBELIUS, in her capacity as Secretary of THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | **ENRICHMENT** |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | Defendants. | |

Plaintiff Natural Molecular Testing Corporation, debtor-in-possession herein, by and through counsel, HACKER & WILLIG, INC., P.S., and MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, P.C. brings this suit as a result of defendants' ongoing and unlawful withholding of substantial amounts of reviewed and approved reimbursements for services rendered, in violation of applicable statutory and regulatory authorities, which withholding has caused its bankruptcy and which withholding is depriving the debtor-in-possession of assets which are now properly the property of the bankruptcy estate. Of the over $22 million of funds held by the defendants that are property of Natural Molecular Testing Corporation, the only claims to date that defendants dispute are reflected in Proof of Claim No. 82 in the amount of $66,200.46 for alleged specific "Medicare overpayments." Specifically, Natural Molecular Testing Corporation respectfully complains, avers, alleges, and states as follows against defendants Centers for Medicare & Medicaid Services; Marilyn Tavenner, in her capacity as Administrator of the Centers for Medicare & Medicaid Services; Noridian Healthcare Solutions, LLC; and Kathleen Sebelius, and/or her successor, in her or his capacity as Secretary of the United States Department of Health and Human Services:

## I. PARTIES

1.1.   Plaintiff Natural Molecular Testing Corporation ("Plaintiff" and/or "NMTC") is a Washington corporation.

1.2.   Defendant Centers for Medicare & Medicaid Services ("CMS") is the federal government agency, and an operating division, within the United States Department of Health and Human Services that administers the federal Medicare and Medicaid programs. CMS

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 2**

maintains a regional office in Seattle, Washington.

1.3.    Defendant Marilyn Tavenner ("Tavenner") is the Administrator of CMS and in such capacity is responsible for ensuring that CMS and its agents comply with applicable law and regulations.

1.4.    Defendant Noridian Healthcare Solutions, LLC ("Noridian") is a limited liability company organized under the laws of Delaware and is the Medicare Parts A and B Medicare Administrative Contractor ("MAC") for Jurisdiction F, which includes Washington.

1.5.    Defendant United States Department of Health and Human Services (through Kathleen Sebelius, and/or her successor, in her or his capacity as Secretary of same) ("DHHS") is a department within the federal government and oversees CMS.  DHHS is a claimant in the main Bankruptcy Case (Case No. 13-12298), having filed two proofs of claim therein on or about March 31, 2014.

## II.  JURISDICTION & VENUE

2.1.    On October 21, 2013 (the "Petition Date") Debtor NMTC filed a voluntary petition seeking relief under Chapter 11 (the "Voluntary Petition") of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Washington (the "Court") and an automatic stay was imposed.

2.2.    This is a proceeding to obtain a detailed accounting from CMS and/or Noridian of all of the amounts due and owing to NMTC for services provided by NMTC to beneficiaries of the Medicare program between September 1, 2012 and December 20, 2013.

2.3.    This is a proceeding to recover sums owing to NMTC that are property of NMTC's Chapter 11 bankruptcy estate, pursuant to Bankruptcy Rule 7001(1).

2.4.    This is a proceeding to obtain an injunction or other equitable relief against Defendants CMS, Administrator Tavenner, Noridian, DHHS, and Secretary Sebelius and/or her successor, for their wrongful seizure of funds which constitute property of NMTC's Chapter 11

*AMENDED* COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTION RELIEF, DAMAGES, ETC. - 3

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Case 13-01635-MLB    Doc 55    Filed 06/27/14    Ent. 06/27/14 09:45:10    Pg. 3 of 31

bankruptcy estate, pursuant to Bankruptcy Rule 7001(7).

2.5.    This is a proceeding to obtain declaratory relief as to property of NMTC's Chapter 11 bankruptcy estate, pursuant to Bankruptcy Rule 7001(9).

2.6.    This is a proceeding to object to the allegedly secured claims filed by Defendant DHHS for alleged Medicare overpayments (Claims 82 and 83), pursuant to Bankruptcy Rule 3007, and to assert counter-claims against Defendants relating to the claims filed.

2.7.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 157(b)(1) and its oral ruling on March 27, 2014 specifically finding that it has jurisdiction.

2.8.    This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C),(E), (F), (H), and/or (O).

2.9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a) because Debtor NMTC's Chapter 11 bankruptcy case is pending in this district.

2.10.    This Amended Complaint should be deemed to constitute notice of the Debtor's objection to proofs of claim by DHHS pursuant to Bankruptcy Rule 3007(a) as it is in writing, filed and gives at least 30 days prior notice of any trial or hearing making final determination on the proofs of claim.


### III.  FACTS

**Background:  NMTC Provides Pharmacogenomic Testing Services To Medicare Beneficiaries**

3.1.    NMTC is a clinical laboratory that provides highly specialized laboratory testing services within the laboratory specialty known as molecular pathology services. Pharmacogenomic testing falls within the category of testing known as molecular pathology. Molecular pathology and pharmacogenomic testing have been growing rapidly.  NMTC provides pharmacogenomic testing to patients as ordered or prescribed by their physicians.

3.2.    NMTC is a voluntary participant in the Medicare program and submits to CMS

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF,**
**STAY VIOLATION, RECOVERY OF PROPERTY,**
**INJUNCTION RELIEF, DAMAGES, ETC. - 4**

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Case 13-01635-MLB    Doc 55    Filed 06/27/14    Ent. 06/27/14 09:45:10    Pg. 4 of 31

claims for payment as an assignee of patients who are beneficiaries under the Medicare program.

3.3.     Medicare is the federally funded health care program established to provide health benefit coverage for elderly and permanently disabled individuals.  Original Medicare, also referred to as fee-for-service Medicare, pays for, among other things, hospital, physician, and laboratory services supplied by a qualified provider to a Medicare beneficiary.

3.4.     CMS is responsible for administering the Medicare program.  CMS contracts with many third party contractors for services that are needed to properly administer the Medicare program and satisfy Medicare program requirements established by the Social Security Act and applicable federal regulations.  CMS contracts with regional MACs to, among other things, process and pay claims for services provided to Original Medicare beneficiaries submitted by qualified providers in the region to which the MAC is assigned.  Noridian is the MAC responsible for processing and paying Medicare claims filed by NMTC.

### Pharmacogenomic Testing

3.5.     Molecular diagnostics apply molecular biology to medical testing in order to analyze biological markers in an individual's genetic code and how cells express the individual's unique genes as proteins.  Molecular diagnostics are used to diagnose and monitor disease, detect risk, and decide which therapies will work best for individual patients.  Each molecular test requires four basic steps:  1. Collection of a specimen; 2. Extraction and purification of nucleic acid; 3. Amplification or the marking of targets; and 4. Detection of the amplified target using various techniques.  Pharmacogenomic test services are ordered by physicians for patients who have been or are about to be prescribed: (a) certain types of medications for certain conditions; or (b) multiple medications. Pharmacogenomic test results are used by physicians to manage their treatment of their patients' diagnosed illness(es).  Specifically, the results provide information to physicians that enables them to select the appropriate drug and dosage to treat a patient's illness based on that patient's genomic characteristics.

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 5**

H A C K E R  &  W I L L I G ,  I N C . ,  P . S .
A T T O R N E Y S  A T  L A W
5 2 0  P i k e  S t r e e t ,  S u i t e  2 5 0 0
S e a t t l e ,  W a s h i n g t o n  9 8 1 0 1
T e l e p h o n e  ( 2 0 6 )  3 4 0 - 1 9 3 5

3.6.    Pharmacogenomics is most often used in cardiology but is appropriate for conditions where the physician is providing treatment that requires a drug metabolized in the liver, generally in the physician specialties of psychiatry, anesthesiology, internal medicine, and geriatrics.  Additionally, physicians order pharmacogenomic testing for patients who are prescribed drugs that pose bleeding risks in compliance with recommendations of the United States Food and Drug Administration.

3.7.    When ordered for patients who have been or are about to be prescribed several high-risk drugs, pharmacogenomics test results help physicians select and adjust both the drugs and the dosages by providing information about the patient's unique ability to metabolize those drugs.  This information ensures that physicians order medications that use the patient's most effective metabolic pathway, in the most effective dose, and that physicians prevent unintended and potentially life-threatening consequences.

3.8.    Physicians order more pharmacogenomic testing for Medicare beneficiaries than for other patients because the diseases, conditions, and prescribed medications that cause physicians to order pharmacogenomic testing occur at a higher incidence in the elderly (i.e. Medicare population) than in younger people.

### Medicare Reimbursement of Clinical Laboratory Services

3.9.    In 1983, Congress mandated both (i) the establishment of the Medicare Clinical Laboratory Fee Schedule, which sets forth the rates that Medicare will reimburse for clinical laboratory testing as described by certain procedure codes, and (ii) the formula for setting those rates.  Medicare reimburses clinical laboratories for pharmacogenomic testing pursuant to the Medicare Clinical Laboratory Fee Schedule.  *See* 42 U.S.C. § 1395I(h).

3.10.   The Medicare Clinical Laboratory Fee Schedule is updated annually.

3.11.   The procedure codes, called current procedural terminology codes ("CPT Codes"), that are used in the Medicare Clinical Laboratory Fee Schedule are developed by the

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 6**

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

American Medical Association ("AMA") and are employed by health care providers to communicate to all health plans, including Medicare, the services the providers supply to the health plan's members.

3.12. The AMA annually updates the CPT codes to reflect changes and advancements in health care services.

3.13. CMS and its MACs update the Medicare Clinical Laboratory Fee Schedule annually to reflect changes in reimbursement rates. Additionally, when the AMA edits CPT codes or adopts new CPT codes, CMS and its MACs evaluate these changes and new codes and establish reimbursement rates for them.

3.14. CMS and its MACs must act promptly to establish reimbursement rates because the Social Security Act and the Medicare Claims Processing Manual, developed by CMS, require that clean claims for Medicare payments filed by providers electronically be processed within fourteen (14) to thirty (30) days of Medicare and/or its MACs receiving the claim (the "Prompt Pay Requirement"). *See* the Social Security Act at 42 U.S.C. §§ 1395u(c)(2) and 1395u(c)(3)(A) and (B)(i) and the Medicare Claims Processing Manual, Chapter 1, Sections 80.2.1.1 and 80.2.1.2. CMS must pay interest on clean claims filed electronically that are not processed in compliance with the Prompt Pay Requirement. *See* 42 U.S.C. § 1395u(c)(2)(C).

3.15. When AMA adopts a new CPT code that CMS deems to be covered by Medicare and no reimbursement rate exists for that code, CMS may use a process known as "gapfilling" to develop a reimbursement rate. When CMS uses gapfilling, its regional MACs set reimbursement rates for the gapfilled CPT code for the first year using a broad range of information outlined at 42 C.F.R. § 414.508(b), and then CMS uses the MACs' information to establish the national reimbursement rates for the affected CPT codes on the applicable Medicare Fee Schedule. This process ensures that providers are able to be promptly paid in accordance with the Prompt Pay Requirement while CMS continues to consider what its national reimbursement rate will be for a given CPT code.

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 7**

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

**CMS Used Gapfilling For The New Molecular CPT Codes For 2013**

3.16.   Prior to 2012, there was no single CPT code that comprehensively described many of the newly developing molecular pathology tests. Instead, laboratories performing each of the molecular pathology tests used multiple CPT codes, which identified the different procedures involved in performing each step of the service, when requesting payment from health plans or payors, including Medicare.  This practice was known as "code stacking."

3.17.   Effective January 2012, the AMA adopted new Molecular Pathology Procedure test codes to describe molecular pathology services, including pharmacogenomic testing (the "new Molecular CPT codes").  CMS did not adopt these new Molecular CPT codes in 2012 for Medicare but instead, in its <u>Calendar Year (CY) 2012 Annual Update for Clinical Laboratory Fee Schedule and Laboratory Services Subject to Reasonable Charge Payment</u> (released December 9, 2011) requested "that Medicare claims for Molecular Pathology Procedures reflect both the existing CPT 'stacked' test codes that are required for payment and the new single CPT test code that would be used for payment purposes if the new CPT test codes were active."

3.18.   On August 31, 2012, CMS announced that it did not have enough information to develop reimbursement rates for the new Molecular CPT codes and instead would recommend "gapfilling" for 2013.

3.19.   On November 1, 2012, CMS published its notice, to be effective January 1, 2013, that it would amend the Clinical Laboratory Fee Schedule to include the new Molecular Pathology Procedure CPT codes.

3.20.   On November 6, 2012, CMS announced that it would in fact use gapfilling to establish 2013 reimbursement rates for the new Molecular CPT codes.

3.21.   As a result of the gapfilling process and in accordance with instructions to them, molecular pathology laboratories continued to provide services and bill Medicare for such services using the "stacked" CPT Codes for services provided up to and including December

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 8**

H A C K E R  &  W I L L I G ,  I N C . ,  P . S .
A T T O R N E Y S  A T  L A W
5 2 0  P i k e  S t r e e t ,  S u i t e  2 5 0 0
S e a t t l e ,  W a s h i n g t o n  9 8 1 0 1
T e l e p h o n e  ( 2 0 6 )  3 4 0 - 1 9 3 5

31, 2012.  Starting on January 1, 2013, these laboratories used the applicable new Molecular CPT codes instead of the former "stacked" CPT Codes to bill Medicare and then waited to learn what amounts Medicare, through its regional MACs, would pay for the testing services that such laboratories had already provided.

3.22.    The reimbursement rates to be used during gapfilling must be established promptly to ensure that providers are paid timely for their services in compliance with the Prompt Pay Requirement.

## CMS And Noridian Have Violated The Prompt Pay Requirement And Have Caused NMTC To Suffer Financial Distress And Ultimately To File For Chapter 11 Bankruptcy

3.23.    As 2013 began, NMTC provided molecular pathology services to Medicare beneficiaries throughout the country and submitted claims using the new Molecular CPT codes in accordance with CMS instructions.  NMTC anticipated that, because it was a Medicare provider in good standing, it would be reimbursed for the services it provided to Medicare beneficiaries, as it always had been.  NMTC was unaware that CMS and Noridian would, for months, both fail to establish reimbursement rates for the new Molecular CPT codes and to process claims and that NMTC would not be paid for its Medicare services as a result of CMS's and Noridian's failure to comply with the Prompt Pay Requirement.  NMTC, incurred the significant costs associated with providing these Medicare services and received no Medicare reimbursement for them for an extended period of time.

3.24.    Providers who suffer harm caused by CMS's and/or its MAC's inability to in a timely fashion process and pay claims can request an "advanced payment" of their pending claims.  In order for an advanced payment to be approved, the following must be true:

- The MAC is unable to process claims timely;
- CMS determines that the prompt payment interest provision specified in section 1842(c) of the Social Security Act is insufficient to make a provider whole; and

*AMENDED* COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 9

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

- CMS approves, in writing, the making of an advance payment by the carrier. *See* 42 C.F.R. § 421.214(c).

3.25.    CMS may approve an advanced payment equal to eighty percent (80%) of the anticipated payment of the pending claims based on the provider's historical assigned claims payment data. *See* 42 C.F.R. § 421.214(f)(1)(i).

3.26.    Medicare regulations require the MAC to inform affected providers if it will be or is unable to process and pay claims timely and to offer providers the option of receiving an advanced payment. *See* 42 C.F.R. § 421.214(e).  Noridian violated this regulation when it failed both to inform NMTC that Noridian would be unable to process and pay claims in a timely manner and offer NMTC the option of receiving an advanced payment.  It was not until NMTC had gone without Medicare reimbursement for over ten weeks and had repeatedly contacted CMS regarding its financial difficulty that CMS offered NMTC assistance.

3.27.    On February 19, 2013, Camber Health Partners ("Camber"), NMTC's contracted billing company, contacted CMS seeking assistance for NMTC after Noridian failed to adequately respond to NMTC's request for assistance and payment of claims.  Camber explained to CMS that the payment delays were affecting claims for dates of service in late 2012 and all of 2013.  CMS informed Camber and NMTC that Noridian was experiencing problems with its claims processing system and that it was unclear when claims would be processed appropriately.

3.28.    Camber and NMTC remained in contact with Noridian and CMS attempting to obtain information as to when NMTC would be paid for its Medicare services.  By February 25, 2013 CMS owed NMTC approximately ten million six hundred thousand dollars ($10,600,000) for Medicare services provided and billed in 2013 and an unknown additional amount for claims for services provided between September and December of 2012.

3.29.    By March 1, 2013, Noridian and CMS informed Camber and NMTC that Noridian would be unable to process claims for molecular tests until April 1, 2013.  As a result

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 10**

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

of CMS's and Noridian's failure to timely process claims, CMS agreed to provide NMTC with an advanced payment.

3.30. On March 15, 2013, CMS granted and NMTC received an advanced payment of approximately four million two hundred thousand dollars ($4,200,000) (the "Advanced Payment"). By the time the Advanced Payment was granted, CMS owed NMTC approximately fourteen million two hundred thousand dollars ($14,200,000) for 2013 services and an unknown additional amount for claims for services provided in late 2012.

3.31. In March 2013, Noridian finally announced the reimbursement rates that it was adopting for the new Molecular CPT codes, almost two months after other MACs had established their reimbursement rates, and again explained that it would be unable to process any claims for the new Molecular CPT codes until April 1, 2013.

3.32. When Noridian finally began processing and paying 2012 claims for molecular testing again, Noridian recovered the Advanced Payment, as required, by withholding payment for claims processed until the amount of funds withheld equaled the Advanced Payment. This recovery began on March 22, 2013 when Noridian at last processed some of NMTC's outstanding 2012 claims through which Noridian recovered approximately one million five hundred thousand dollars ($1,500,000).

3.33. On April 1, 2013, in accordance with CMS's and Noridian's guidance, NMTC submitted approximately 89,000 claims for payment using the new Molecular CPT codes for the services it had provided to Medicare beneficiaries between January 1, 2013 and March 31, 2013. The Medicare total allowable reimbursement amounts for the submitted claims equaled approximately seventeen million one hundred thousand dollars ($17,100,000). Noridian processed and approved the claims submitted but has not released the significant majority of funds that are due and owing to NMTC. First, Noridian appropriately used a portion of the funds from the approved claims to finish recovering the Advanced Payment (approximately two million seven hundred thousand dollars ($2,700,000)), which was completed on April 18, 2013.

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 11**

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Case 13-01635-MLB    Doc 55    Filed 06/27/14    Ent. 06/27/14 09:45:10    Pg. 11 of 31

Second, Noridian paid approximately one million two hundred thousand dollars ($1,200,000) to NMTC between April 19, 2013 and April 23, 2013. The remaining approximately thirteen million two hundred thousand dollars ($13,200,000) remains approved and has been wrongfully withheld from NMTC.

3.34. Between April 1, 2013 and April 23, 2013, NMTC performed approximately 32,000 Medicare tests for which it has now submitted claims to Noridian. Noridian processed and approved many of these claims but has not released the payments to NMTC. The Medicare total allowable reimbursement amounts for these claims equal approximately five million nine hundred forty five thousand dollars ($5,945,000).

3.35. The amount of withheld funds that are due and owing to NMTC for services provided between January 1, 2013 and April 23, 2013 is estimated to be in excess of nineteen million one hundred forty five thousand dollars ($19,145,000) (the "Gapfilling Funds") plus the interest payable on these claims for Noridian's failure to comply with the Prompt Payment Requirement. *See* 42 U.S.C. § 1395u(c)(2)(C) and the Medicare Claims Processing Manual, Chapter 1, Section 80.2.2.

3.36. The amount of withheld funds that are due and owing to NMTC for services provided in late 2012 is unknown (the "2012 Funds").

3.37. NMTC's current economic distress is the direct result of CMS and Noridian failing to fulfill their statutory and procedural obligations to NMTC as a service provider. The gapfilling process for the new Molecular CPT codes as administered by CMS and Noridian resulted in NMTC experiencing substantial harm and economic distress because NMTC did not receive timely payment, as is required by the Social Security Act and CMS instruction, for almost four (4) months during which time NMTC provided services to Medicare beneficiaries without compensation.

3.38. During this time, NMTC acted in the best interest of the Medicare patients whom physicians referred to NMTC for testing. NMTC incurred significant costs processing

*AMENDED* COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 12

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

these tests, providing the results to physicians, and processing the claims it submitted to Noridian. NMTC appropriately anticipated that, because it was a Medicare provider in good standing, it would be reimbursed for the services it provided to Medicare beneficiaries, as it always had been.

3.39. Many of the costs that NMTC incurred to provide its services to Medicare beneficiaries from January 1, 2013 through April 23, 2013 resulted in debts to creditors listed in NMTC's Voluntary Petition filed with this Court on October 21, 2013.

**CMS Audit Of NMTC And Suspension Of Medicare Payment**

3.40. After receiving notice in July 2012, NMTC underwent a CMS Zone Program Integrity Contractor ("ZPIC") audit in late August of 2012. CMS's ZPIC for NMTC's Zone, AdvanceMed Corporation ("AdvanceMed"), conducted the audit on August 22 and 23, 2012 and ultimately requested that NMTC change its test order form. As a result of investigating and responding to AdvanceMed's request, NMTC learned that Camber's billing system had been inappropriately overriding the diagnosis codes entered by physicians and reported by NMTC. The diagnosis codes are different from CPT codes and are used to describe the patient's condition and provide information about what caused the treating physician to order the tests. NMTC immediately took corrective action. All billing to Medicare was halted until the defect was corrected. Once Camber fixed its system, all of the NMTC claims that had been improperly billed by Camber's faulty system were properly re-billed to Noridian with the correct codes. NMTC changed its billing form to conform to AdvanceMed's suggestions and informed AdvanceMed of the remedial actions NMTC had taken. AdvanceMed has never commented on these corrective actions.

3.41. Then, eight (8) months later, on April 24, 2013 (the "Suspension Date") CMS abruptly suspended all Medicare payments to NMTC (the "Suspension"). CMS provided a suspension notice dated April 25, 2013 to NMTC through AdvanceMed. The suspension notice

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTION RELIEF, DAMAGES, ETC. - 13**

H A C K E R  &  W I L L I G ,  I N C . ,  P . S .
A T T O R N E Y S  A T  L A W
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

stated that the "suspension of [NMTC's] Medicare payments took effect on April 24, 2013" and that the suspension of payment "involves credible allegations of fraud". Almost no other information was provided. The suspension notice included a list of **five claims**, with dates of service between June 2011 and March 2012. These five claims provided the basis for the Suspension, which has resulted in the withholding of over $19 million in payments. Aside from these five claims, CMS did not dispute any other claims. These five claims had all been processed and paid prior to the Suspension Date. None of these five claims has been formally objected to or disallowed by CMS and these claims do not form part of the specific claim for "Medicare overpayment" set forth in Claim No. 82 filed by DHHS.

3.42.   The Social Security Act grants CMS the authority to suspend Medicare payments to providers under certain circumstances, including when CMS, in consultation with the Office of Inspector General for the DHHS, has determined that a credible allegation of fraud exists against a provider. *See* 42 C.F.R. § 405.371(a)(2). A credible allegation of fraud can be based on any source including but not limited to claims data mining and patterns identified through provider audits. *See* 42 C.F.R. § 405.370.

3.43.   In accordance with Medicare regulations and CMS guidance, NMTC provided detailed written rebuttal statements to CMS and AdvanceMed on May 8, 2013 and again on May 20, 2013. CMS responded on June 19, 2013 that it had reviewed NMTC's rebuttal statements and had nevertheless decided to continue the Suspension.

3.44.   In addition, NMTC's representatives met with CMS representatives in July 2013 and provided additional information supporting the revocation of the Suspension. Since that time, CMS has provided NMTC with no substantive responses or further explanation of CMS's actions, investigation, or conclusions.

3.45.   As of May 21, 2014, CMS has not provided any further information to support its suspension of payments, and has not asserted any right to these funds, in whole or in any part, to the extent they have been adjudicated and approved for payment to NMTC.

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 14**

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Case 13-01635-MLB   Doc 55   Filed 06/27/14   Ent. 06/27/14 09:45:10   Pg. 14 of 31

3.46.    Medicare regulations and guidance allow providers, such as NMTC, which have had payment suspended to continue to provide and submit claims for services provided to Medicare beneficiaries during the payment suspension.  The claims that a provider submits during a payment suspension are processed in the same manner as they would be if the provider had not had its payments suspended, except that payment is not released to the provider.

3.47.    Since April 24, 2013, NMTC has continued to provide services to Medicare beneficiaries and submit claims for payment to Noridian and CMS, but in a reduced capacity. NMTC has lost most of its business because most physicians refuse to use a laboratory that requires Medicare beneficiaries to be distinguished from patients insured by others.  Therefore, NMTC is unable to continue to service many of its existing accounts because it cannot afford to absorb the costs it incurs to perform Medicare services while CMS continues to withhold all payments that are due and owing to NMTC.

3.48.    Between April 24, 2013 and October 21, 2013, NMTC completed and has now billed for approximately 19,585 tests that it performed for Medicare beneficiaries.  NMTC timely submitted claims for payment for these services to Noridian, and these claims have been processed and approved for payment in part, and  the total expected allowance is approximately three million two hundred ten thousand dollars ($3,210,000), but these payments have not been released to NMTC (the "Suspension Funds").

3.49.    On October 21, 2013, NMTC received notice from CMS stating that it had extended the Suspension for an additional 180 days.

3.50.    On April 21, 2014, NMTC received a letter from AdvanceMed stating that under 42 C.F.R. § 405.372(d)(2), CMS has directed AdvanceMed to extend the Suspension for an additional 180 days effective April 18, 2014.

3.51.    Under 42 C.F.R. § 405.372(d)(2), CMS is limited to a one-time extension of 180 days in addition to the initial 180 days to determine an overpayment.  This time limit does not apply only if the Office of Inspector General of DHHS or another law enforcement agency

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 15**

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Case 13-01635-MLB    Doc 55    Filed 06/27/14    Ent. 06/27/14 09:45:10    Pg. 15 of 31

certifies that the matter is under an investigation that warrants a continued suspension. Thus, the AdvanceMed letter dated April 18, 2014, appears to be without legal authority to continue the Suspension beyond two 180-day time periods.

3.52. Under CMS regulations, while a suspension is in effect, a provider cannot appeal the suspension decision. The only course that a suspended provider may take is to submit an initial rebuttal statement, which NMTC did in May 2013.

## On October 21, 2013, NMTC Filed For Bankruptcy Under Chapter 11 After CMS Had Failed To Pay NMTC For Medicare Services For Almost Ten Months

3.53. Without receiving the Gapfilling Funds that NMTC is due and owed from CMS for the services NMTC provided from January 1, 2013 to April 23, 2013 and without receiving the 2012 Funds for the outstanding 2012 claims, NMTC became unable to pay all of its debts in a timely fashion, and its overhead expenses thereby became oppressive.

3.54. NMTC has been sued by several of its alleged creditors. In addition, NMTC has amassed substantial legal bills to defend legal challenges from alleged creditors and from the vague allegations in CMS's Suspension Notice.

3.55. NMTC has been forced to undergo four (4) cycles of layoffs since the Suspension Date. Of its original employees and independent contractors, NMTC has only been able to retain under five percent (5%) of its total staff.

3.56. On October 21, 2013, after enduring almost ten months without Medicare payments for the services that it provided from January 1, 2013 through October 20, 2013, NMTC was forced to file its Voluntary Petition for relief, in hopes of restructuring its debt with its contractors/creditors and in an effort to salvage its business. The automatic stay was granted on that date.

3.57. Notice of the bankruptcy and the automatic stay were provided directly to CMS on or about October 25, 2013. Despite the automatic stay imposed on the Petition Date, CMS

*AMENDED* COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 16

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Case 13-01635-MLB    Doc 55    Filed 06/27/14    Ent. 06/27/14 09:45:10    Pg. 16 of 31

remains in complete possession and control of the Gapfilling Funds and the Suspension Funds which together equal approximately twenty two million three hundred fifty five thousand dollars ($22,350,000), and the 2012 Funds, all that were earned and approved prior to NMTC's Voluntary Petition.

3.58.   From October 22, 2013 to May 22, 2014, NMTC processed approximately 749 tests for Medicare beneficiaries, but Noridian has not reimbursed NMTC for any of them. NMTC timely submitted claims for payment for these services to Noridian and these claims have been processed and approved for payment in the amount of approximately one hundred twenty one thousand dollars ($121,000) but this payment has not been released to NMTC (the "Post-Petition Funds") despite the automatic stay.  NMTC continues to perform testing for Medicare beneficiaries on an ongoing basis, so this Post-Petition Funds calculation is subject to increase.

**The 2012 Funds, the Gapfilling Funds, the Suspension Funds and the Post-Petition Funds Have Been  Approved for Payment and are Property of NMTC's Chapter 11 Estate.**

**The 2012 Funds and Gapfilling Funds**

3.59.   As set forth above, the Social Security Act requires CMS and its contractor, Noridian, to process and pay electronically filed clean claims (claims that include the required information) filed by a clinical laboratory within fourteen (14) to thirty (30) days following receipt of the claim.  *See* 42 U.S.C. §§ 1395u(c)(2) and 1395u(c)(3)(A) and (B)(i).  The Social Security Act recognizes a laboratory's legal and equitable interest in the funds that become due and owing to the laboratory within the Prompt Pay Requirement time period (fourteen to thirty days) and requires CMS to pay interest on the clean claims that its MACs fail to process and pay in compliance with the Prompt Pay Requirement.

3.60.   The 2012 Funds and the Gapfilling Funds are derived from claims timely filed

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTION RELIEF, DAMAGES, ETC. - 17**

Hacker & Willig, Inc., P.S.
Attorneys at Law
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

and services provided between sixteen (16) and eight (8) months ago, September 2012 through April 2013. Payments have been due and owing to NMTC, and NMTC has had a legal and equitable interest in these payments starting thirty (30) days after NMTC electronically filed each clean claim that resulted in the approval and accumulation of the 2012 Funds and the Gapfilling Funds.

3.61. The 2012 Funds and the Gapfilling Funds have been processed and approved by Noridian for payment, but Noridian has failed to pay NMTC timely as required by the Social Security Act and has continued to fail to release the 2012 Funds and the Gapfilling Funds to NMTC.

3.62. CMS recognized both NMTC's right to receive payment of the 2012 Funds and the Gapfilling Funds and Noridian's failure to comply with the Prompt Payment Requirement by agreeing to provide NMTC with the Advanced Payment.

3.63. Further, the 2012 Funds and the Gapfilling Funds are not subject to the Suspension because the services and the claims from which the Funds were derived were all performed and submitted prior to the effective date of the Suspension, April 24, 2013.

3.64. CMS regulations require that a provider be given a written notice stating the date a suspension becomes or became effective. NMTC's notice of suspension states that the suspension became effective on April 24, 2013. CMS may not retroactively suspend payment for claims that were due and owing prior to the effective date of suspension.

3.65. Defendants have never raised any actual dispute relating to any of the claims constituting those claims that are part of the Gapfilling Funds, the 2012 Funds, the Suspension Funds, or the Post-Petition Funds. Rather, the funds are approved for payment, held in suspense, and Defendants claim that they are "investigating."

**The Suspension and Post-Petition Funds**

3.66. The Suspension and Post-Petition Funds are property of NMTC's Chapter 11

*AMENDED* COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 18

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Case 13-01635-MLB   Doc 55   Filed 06/27/14   Ent. 06/27/14 09:45:10   Pg. 18 of 31

Estate.  NMTC obtained a legal and equitable interest in the Suspension and Post-Petition Funds, following provision of services, when Noridian processed and approved the claims from which the Suspension and Post-Petition Funds were derived.

3.67.   Claims filed by a provider during a payment suspension continue to be processed in accordance with normal claims processing requirements and MACs must continue to provide remittance advices to the provider showing that claims have been approved for payment but that payment has not been sent. *See* Medicare Program Integrity Manual, Chapter 8, Section 8.3.2.3.1.

3.68.   CMS further instructs its contractors as follows: "Contractors, MACs … and ZPICs shall maintain an accurate, up-to-date record of the amount withheld and the claims that comprise the suspended amount.  Contractors, MACs, … and ZPICs shall keep a separate accounting of payment on all claims affected by the suspension.  They shall keep track of how much money is uncontested and **due the provider.** [*emphasis added*] The amount needs to be known as it represents assets [of the provider] that may be applied to reduce or eliminate any overpayment [owed to CMS].  Contractors, MACs, … and ZPICs shall be able to provide, upon request, copies of the claims affected by the suspension.  After the suspension has been removed, they shall apply the amount withheld first to the Medicare overpayment and then to reduce any other obligation to CMS or to DHHS.  Contractors and MACs shall remit to the provider all monies held in excess of the amount the provider owes.  If the provider owes more money than was held in suspension, the contractor or MAC shall initiate recoupment action." *See* Medicare Program Integrity Manual, Chapter 8, Section 8.3.2.6.

3.69.   As CMS recognizes in its Medicare Program Integrity Manual, claims processed and approved during a payment suspension produce funds that are due to the provider and are held by CMS as an asset of the provider while CMS determines whether the provider owes CMS or DHHS any obligation under a variety of theories. *See* Medicare Program Integrity Manual, Chapter 8, Section 8.3.2.6.

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTION RELIEF, DAMAGES, ETC. - 19**

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

1    3.70.   CMS cannot hold the property of NMTC's Chapter 11 estate to the detriment of

2    NMTC's creditors.  The 2012 Funds plus the statutorily required interest, the Gapfilling Funds

3    plus the statutorily required interest, the Suspension Funds and the Post-Petition Funds (the

4    "Withheld Funds") are all property of NMTC's Chapter 11 estate and are necessary for NMTC's

5    plan of reorganization.  By refusing to release the Withheld Funds to NMTC's Chapter 11

6    estate, CMS is seeking preferential treatment to the detriment of NMTC's creditors.

7

8    **CMS and Noridian Have Not Provided NMTC With Comprehensive Documentation**

9    **Regarding the 2012 Funds, the Gapfilling Funds, the Suspension Funds, and the Post-**

10   **Petition Funds**

11   3.71.   As explained above, Noridian's claims processing system failed to operate and

12   process claims for molecular pathology testing from January 1, 2013 through March 31, 2013.

13   During this time and up through today, Noridian has not provided NMTC with an accounting

14   of the Withheld Funds that Noridian is withholding.

15   3.72.   As a result of Noridian not providing an accounting of the Withheld Funds, all

16   of the dollar amounts reported here are approximations based on the type and number of claims

17   that NMTC has submitted, the documentation that NMTC has received that communicates that

18   the claims have been processed and approved, and the Medicare allowable reimbursement

19   amounts for the tests provided.

20   3.73.   Noridian is required to maintain the information relating to the Withheld Funds

21   in accordance with CMS guidance.  *See* Medicare Program Integrity Manual, Chapter 8, Section

22   8.3.2.6.

23

24   **NMTC Will Be Irreparably Harmed If CMS Continues to Withhold the Withheld Funds**

25   **and Violate the Automatic Stay.**

26   3.74.   NMTC has a clear legal and equitable right to the Withheld Funds and CMS has

*AMENDED* COMPLAINT FOR DECLARATORY RELIEF,
STAY VIOLATION, RECOVERY OF PROPERTY,
INJUNCTIVE RELIEF, DAMAGES, ETC. - 20

violated that right by first failing to comply with the Prompt Payment Requirement and then by violating the automatic stay by failing to turn over the Withheld Funds to NMTC's Chapter 11 estate.

3.75.    And, it is not only NMTC that has been significantly impacted by these improper actions by CMS, DHHS, and Medicare.  There appears to be a similar and disturbing trend developing around the country.  *See*, *Cal. Clinical Laboratory Assn. v. Secretary of Health and Human Services*, Case No. 1:14-cv-00673-KBJ, U.S. District Court for the District of Columbia, Complaint filed on April 18, 2014.

3.76.    If CMS continues to withhold the Withheld Funds and continues to violate the automatic stay, NMTC will be irreparably harmed and may be forced to abandon its reorganization plan and may be forced into liquidation.

3.77.    CMS's continued withholding of the Withheld Funds to the detriment of NMTC's other creditors eviscerates the goals of the Bankruptcy Code and fails to maximize the value that could be obtained for the collective creditor body.

**Defendants Have Filed Proofs Of Claim Against NMTC And Have Therefore Submitted To The Jurisdiction Of The Bankruptcy Court.**

3.78.    The Defendants have now filed Proofs of Claim in NMTC's pending Chapter 11 case.  [*See*, Claim Nos. 82 and 83, both dated March 31, 2014 (jointly, the "Proofs of Claim").] NMTC objects to the Proofs of Claim and seeks to have them denied in their entirety.

3.79.    Claim No. 83 is in an unliquidated amount and is allegedly for "Medicare overpayments."  Claim No. 83 is supported by the Declaration of Jennifer Magyar (the "Magyar Declaration"), who testifies that the unliquidated claim "represents a contingent, unliquidated amount to be determined upon resolution of a post-payment Program Integrity Medical Review of the Debtor's Medicare claims, and upon final determination of **an(y)** overpayment amount." She further testifies that:  "**If** CMS, acting through AdvanceMed, discovers improprieties or

*AMENDED* COMPLAINT FOR DECLARATORY RELIEF,
STAY VIOLATION, RECOVERY OF PROPERTY,
INJUNCTIVE RELIEF, DAMAGES, ETC. - 21

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

errors in the Debtor's billed claims, **it will determine an overpayment amount**." And: "[t]he Program Integrity Medical Review has not been completed, and the Secretary has not finally determined an overpayment owed by the Debtor." (Emphasis added.) There is no evidence presented that Defendants have any dispute as to the claims submitted. In fact, Claim No. 83 makes clear that despite investigating NMTC for a full year, it has not reached any conclusion as to whether there have been any overpayments (with the exception of those claims specifically set forth in Claim No. 82).

3.80.   Claim No. 82 is in the amount of $66,200.46 for alleged specific "Medicare overpayments." These alleged findings of overpayment were made and issued via letter to NMTC between May 2, 2013 and September 25, 2013. This apparently represents the complete universe of "Medicare overpayments" that Defendants have been able to identify since the Suspension Date through the Petition Date. The dates of service for the alleged overpayments range from October 2011 through April 2013.

## IV.  **FIRST CAUSE OF ACTION**

### Declaratory Relief as to Property of the Estate

4.1.   NMTC incorporates and realleges all foregoing paragraphs hereof as if fully set forth herein.

4.2.   Pursuant to 11 U.S.C. § 541(a)(1), NMTC's Chapter 11 estate is comprised of "all legal and equitable interests of the debtor in property as of the commencement of the case" wherever located and by whomever held.

4.3.   NMTC immediately became vested with both legal and equitable interest in the 2012 Funds upon CMS's processing and approval of the claims for payment for Medicare services provided between September 1, 2012 and December 31, 2012.

4.4.   NMTC immediately became vested with both legal and equitable interest in the interest on the 2012 Funds upon CMS's and Noridian's failure to comply with the statutory

*AMENDED* COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 22

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Case 13-01635-MLB   Doc 55   Filed 06/27/14   Ent. 06/27/14 09:45:10   Pg. 22 of 31

Prompt Pay Requirements.

4.5.     NMTC immediately became vested with both legal and equitable interest in the Gapfilling Funds (approximately $19,145,000) upon CMS's processing and approval of the claims for payment for Medicare services provided between January 1, 2013 and April 23, 2013.

4.6.     NMTC immediately became vested with both legal and equitable interest in interest on the Gapfilling Funds upon CMS's and Noridian's failure to comply with the statutory Prompt Pay Requirements.

4.7.     NMTC immediately became vested with both legal and equitable interest in the Suspension Funds (approximately $3,210,000) upon CMS's processing and approval of the claims for payment for Medicare services provided between April 24, 2013 and October 21, 2013.

4.8.     NMTC immediately became vested with both legal and equitable interest in the Post-Petition Funds (approximately $121,000) upon CMS's processing and approval of the claims for payment for Medicare services provided between October 21, 2013 and May 22, 2014.

4.9.     However, CMS continues to maintain possession and control of the 2012 Funds, the Gapfilling Funds, the Suspension Funds, and the Post-Petition Funds that constitute property of NMTC's Chapter 11 estate.

4.10.   NMTC requests this Court's declaratory relief that the 2012 Funds (amount unknown), the Gapfilling Funds (approximately $19,145,000) plus the statutorily required interest, the Suspension Funds (approximately $3,210,000), and the Post-Petition Funds (approximately $121,000 through May 22, 2014) constitute property of NMTC's Chapter 11 estate.

## V. <u>SECOND CAUSE OF ACTION</u>

### Violation of the Automatic Stay: Recovery of Property of the Estate

*AMENDED* COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 23

5.1.     NMTC incorporates and realleges all foregoing paragraphs hereof as if fully set forth herein.

5.2.     Pursuant to 11 U.S.C. § 362(a)(1), NMTC's filing of a Chapter 11 petition operates as a stay, applicable to all entities, of "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was … commenced before … the [Chapter 11] case…, or to recover a claim against the debtor that arose before the commencement of the case … [.]"

5.3.     Pursuant to 11 U.S.C. § 362(a)(3), Defendants are stayed from "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]"

5.4.     Pursuant to 11 U.S.C. § 362(a)(6), Defendants are stayed from "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case … [.]"

5.5.     Pursuant to 11 U.S.C. § 362(a)(7), Defendants are stayed from "the setoff of any debt owing to the debtor that arose before the commencement of the case … against any claim against the debtor[.]"

5.6.     As the Withheld Funds, to the extent not subject to dispute pursuant to the CMS Claim No. 82, constitute property of NMTC's Chapter 11 estate and by operation of the automatic stay and pursuant to 11 U.S.C. § 542, CMS and any other Defendants holding NMTC's property are required to turn over to Debtor NMTC the undisputed portion of said Withheld Funds.

5.7.     CMS has willfully and in bad faith refused to comply with the automatic stay by having failed to turn over the undisputed portion of the Withheld Funds.

5.8.     NMTC requests that this Court order turn over to Debtor NMTC of all Withheld Funds held by CMS and other Defendants.

*///*

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 24**

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Case 13-01635-MLB    Doc 55    Filed 06/27/14    Ent. 06/27/14 09:45:10    Pg. 24 of 31

///

## VI. <u>THIRD CAUSE OF ACTION</u>

### Replevin/Turnover

6.1    NMTC incorporates and realleged all foregoing paragraphs hereto as if fully set forth herein.

6.2    Pursuant to RCW 7.64.010 et seq. and/or 11 U.S.C. § 542, with the exception of any such claims which have been specifically disputed by Defendants in Claim No. 82, NMTC is entitled to immediate delivery of all of the Withheld Funds, of which NMTC is the proper owner entitled to possession, as such Withheld Funds have been wrongfully detained by the Defendants herein.

## VII. <u>FOURTH CAUSE OF ACTION</u>

### Injunctive Relief

7.1.    NMTC incorporates and realleges all foregoing paragraphs hereof as if fully set forth herein.

7.2.    For the foregoing violations of the automatic stay for Defendants' failure to turn over property of the Chapter 11 estate, NMTC requests that Defendants be enjoined from applying the Withheld Funds on any theory of offset or recoupment.

7.3.    Failure to grant such injunctive relief will force NMTC to suffer irreparable injury in that its continued ability to operate its business and develop a feasible plan of reorganization is in jeopardy; such injury outweighs any harm which granting the injunction would inflict upon Defendants; the facts set forth in detail above demonstrate a likelihood of success on the merits; and public interest will not be adversely affected, and in fact will be protected by imposition of an injunction.

///

///

*AMENDED* COMPLAINT FOR DECLARATORY RELIEF,
STAY VIOLATION, RECOVERY OF PROPERTY,
INJUNCTIVE RELIEF, DAMAGES, ETC. - 25

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Case 13-01635-MLB    Doc 55    Filed 06/27/14    Ent. 06/27/14 09:45:10    Pg. 25 of 31

### Damages

8.1.    NMTC incorporates and realleges all foregoing paragraphs hereof as if fully set forth herein.

8.2.    For the foregoing violations of the automatic stay and for Defendants' willful and wrongful retention of the Withheld Funds duly owing to NMTC and which constitute property of NMTC's Chapter 11 estate, NMTC requests an award of damages, including but not limited to NMTC's actual damages for economic loss, general damages, and speculative damages

8.3.    Defendants are jointly and severally liable for all damages suffered by NMTC as a result of the wrongful retention of the Withheld Funds.


### IX.  <u>SIXTH CAUSE OF ACTION</u>

### Objection To Claims 82 and 83

9.1    NMTC incorporates and realleges all foregoing paragraphs hereof as if fully set forth herein.

9.2    Defendants, through the U.S. Department of Health and Human Services, filed the Proofs of Claim in NMTC's underlying Bankruptcy Case (collectively, the "Proofs of Claim").  Claim No. 83 does not allege a specific dollar amount owed by Debtor, but instead classifies the amount of the claim as "unliquidated."  The attachment to Claim No. 83 includes the Magyar Declaration, made by Magyar acting as "Associate Regional Administrator" for CMS, Region 10.  While the Magyar Declaration discusses the Suspension, it fails to identify <u>any specific</u> Medicare claim subject to an actual dispute by CMS.  Instead, Magyar states:

> On or about April 25, 2013, CMS imposed a payment suspension against the Debtor.  This suspension has **temporarily halted** payments to the Debtor, pending resolution of **an investigation of claims** – past and present – thereby allowing CMS to verify **whether** they were/are valid claims and **whether** they were/are being appropriately paid.

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 26**

H a c k e r  &  W i l l i g ,  I n c . ,  P . S .
A t t o r n e y s  a t  L a w
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Case 13-01635-MLB    Doc 55    Filed 06/27/14    Ent. 06/27/14 09:45:10    Pg. 26 of 31

*See*, Magyar Declaration, ¶ 13 (emphasis added). By its own admission, CMS has not determined that any of Debtor's claims are invalid.

9.3     Proof of Claim 83 must be denied for indefiniteness. There is inadequate support for such claim and no information provided to support any claim at all.

9.4     Proofs of Claim 82 and 83 must be denied secured status. The Defendants provide no evidence whatsoever to support any claim for secured status. No security agreement or other evidence of any grant of security is attached to either Proof of Claim and no evidence is presented supporting a claim of security. The Defendants have no right to setoff or recoupment and have provided no evidence in support of any such right.

9.5     The Proofs of Claim cannot be allowed pending adjudication of NMTC's claim for turnover of the Withheld Funds pursuant to 11 U.S.C. 542. 11 U.S.C. § 502(d), regarding the claims allowance process, provides:

> Notwithstanding subsections (a) and (b) of this section, **the court shall disallow any claim of any entity from which property is recoverable under section 542**, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, **unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section** 522(i), **542**, 543, 550, or 553 of this title.

11 U.S.C. § 502(d).


## X. <u>SEVENTH CAUSE OF ACTION</u>

### Account Stated

10.1    NMTC incorporates and realleges all foregoing paragraphs hereof as if fully set forth herein.

10.2    The Defendants, and each of them, have breached their duties to pay NMTC for services provided and billed, such bills having been processed and approved for payment. Defendants have not disputed the services provided or the invoices submitted in any substantive

*AMENDED* COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 27

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Case 13-01635-MLB    Doc 55    Filed 06/27/14    Ent. 06/27/14 09:45:10    Pg. 27 of 31

way, but have merely suspended payment indefinitely. Pursuant to the terms of the invoices and Medicare Enrollment Agreements, NMTC seeks a judgment against Defendants, jointly and severally, for all amounts due and owing under the invoices submitted and approved, including interest thereon, costs of collection, and attorneys' fees.

10.3    NMTC hereby seeks release and payment of the Withheld Funds in counterclaim to Defendants' Claims No. 82 and 83.

## XI. EIGHTH CAUSE OF ACTION

### Unjust Enrichment

11.1    NMTC incorporates and realleges all foregoing paragraphs hereof as if fully set forth herein.

11.2    The Defendants accepted services and supplies from NMTC on behalf of Medicare patients and have benefitted from the provision of such services and supplies. Defendants have failed and refused to compensate NMTC for those services and supplies. Therefore, the Defendants have been unjustly enriched if they are not held accountable and required to repay the entire outstanding balance, plus all fees, interest, costs of collection, and attorneys' fees.

11.3    NMTC hereby seeks release and payment of the Withheld Funds in counterclaim to Defendants' Claims No. 82 and 83.

## XII.  NINTH CAUSE OF ACTION

### Quantum Meruit

12.1    NMTC incorporates and realleges all foregoing paragraphs hereof as if fully set forth herein.

12.2    The Defendants accepted services and supplies from NMTC on behalf of Medicare patients and have benefitted from the provision of such services and supplies.

*AMENDED* COMPLAINT FOR DECLARATORY RELIEF,
STAY VIOLATION, RECOVERY OF PROPERTY,
INJUNCTIVE RELIEF, DAMAGES, ETC. - 28

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

Case 13-01635-MLB    Doc 55    Filed 06/27/14    Ent. 06/27/14 09:45:10    Pg. 28 of 31

Defendants have failed and refused to compensate NMTC for those services and supplies. Therefore, the Defendants have been unjustly enriched if they are not held accountable and required to repay the entire outstanding balance, plus all fees, interest, costs of collection, and attorneys' fees.

12.3    NMTC hereby seeks release and payment of the Withheld Funds in counterclaim to Defendants' Claims No. 82 and 83.

## XIII.  TENTH CAUSE OF ACTION

### Breach of Contract/Supplier Agreement

13.1    NMTC incorporates and realleges all foregoing paragraphs hereof as if fully set forth herein.

13.2    The Defendants accepted services and supplies from NMTC on behalf of Medicare patients and have benefitted from the provision of such services and supplies. Pursuant to the Medicare Supplier Agreement, NMTC has agreed to accept assignment of Medicare Part B payment for all such services provided.  Defendants are in breach of the agreement by failing to pay NMTC.

13.3    The Defendants asserted to the Court in this proceeding that the payment of funds from Medicare to NMTC is pursuant to a contract, and generally treat Medicare Supplier Agreements in bankruptcy proceedings as Executory Contracts.

13.3    NMTC hereby seeks release and payment of the Withheld Funds in counterclaim to Defendants Claims' No. 82 and 83.

## IX.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff NMTC respectfully requests that this Court:

A.    Enter an order requiring CMS and Noridian to provide a detailed accounting to NMTC of all claims filed by NMTC and processed by CMS and Noridian, and all amounts

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF, STAY VIOLATION, RECOVERY OF PROPERTY, INJUNCTIVE RELIEF, DAMAGES, ETC. - 29**

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

approved for reimbursement between September 1, 2012 and December 20, 2013.

B. Enter a declaratory judgment in favor of NMTC declaring that the 2012 Funds (amount unknown), the Gapfilling Funds (approximately $19,145,000) plus the statutorily required interest, the Suspension Funds (approximately $3,210,000), and the Post-Petition Funds (approximately $121,000) plus the statutorily required interest constitute property of NMTC's Chapter 11 estate;

C. Enter an order requiring immediate turnover to NMTC's Chapter 11 estate of the Gapfilling Funds (approximately $19,145,000) plus the statutorily required interest, the Suspension Funds (approximately $3,210,000), the Post-Petition Funds (approximately $121,000) and the 2012 Funds (amount unknown) plus the statutorily required interest;

D. Enter an order precluding Defendants from suspending or holding any payments owing for services provided on or after December 20, 2013;

E. Enter an order disallowing the DHHS Proofs of Claim, Claim Nos. 82 and 83, in their entirety;

F. Enjoin Defendants from applying any of the Withheld Funds toward any amounts that may be owing by NMTC under any theory of offset or recoupment;

G. Award NMTC its requested damages to be further proven at trial;

H. Award NMTC its attorneys' fees and costs; and

I. Permit further relief as this Court deems to be just, equitable, and proper.

DATED this 27th day of June, 2014.

Respectfully submitted,

HACKER & WILLIG, INC., P.S.


/s/ Elizabeth H. Shea
Arnold M. Willig, WSBA #20104
Elizabeth H. Shea, WSBA #27189
Charles L. Butler, III, WSBA #36893
Attorneys for the Debtor

*AMENDED* COMPLAINT FOR DECLARATORY RELIEF,
STAY VIOLATION, RECOVERY OF PROPERTY,
INJUNCTIVE RELIEF, DAMAGES, ETC. - 30

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935

MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.


*/s/ Laurence J. Freedman (via email confirmation 6/26/14)*
Hope S. Foster, DC Bar No. 182998
Tracy A. Miner, MA Bar No. 547137
Laurence J. Freedman, DC Bar No. 423099
       Pro Hac Vice
Special Counsel for the Debtor

*AMENDED* **COMPLAINT FOR DECLARATORY RELIEF,
STAY VIOLATION, RECOVERY OF PROPERTY,
INJUNCTIVE RELIEF, DAMAGES, ETC. - 31**

HACKER & WILLIG, INC., P.S.
ATTORNEYS AT LAW
520 Pike Street, Suite 2500
Seattle, Washington 98101
Telephone (206) 340-1935