1        UNITED STATES BANKRUPTCY COURT

2        WESTERN DISTRICT OF WASHINGTON

3                 AT SEATTLE

4   _____

5   In re:                    )
                              )
6   NATURAL MOLECULAR TESTING  )      No. 13-19298
    CORPORATION,              )
7                              )
              Debtor.         )
8   _____)
                              )
9   NATURAL MOLECULAR TESTING  )
    CORPORATION,              )
10                             )
              Plaintiff,      )
11                             )
        vs.                    )      No. 13-01635
12                             )
    CENTERS FOR MEDICARE and   )
13  MEDICAID SERVICES, et al., )
                              )
14            Defendants.      )
    _____

15
     TRANSCRIPT OF THE DIGITALLY-RECORDED PROCEEDINGS
16
          BEFORE THE HONORABLE MARC L. BARRECA
17
                 AUGUST 28, 2014
18  _____

19

20

21

22

23

24  Transcribed by:  Robyn Oleson Fiedler
                     CSR #1931
25

                 AHEARN & ASSOCIATES
              ahearnandassoc@comcast.net

```
 1              A P P E A R A N C E S

 2

 3         For the Defendants:

 4                  MS. CHRISTINA FOGG
                    U.S. ATTORNEY'S OFFICE
 5                  700 Stewart Street, Suite 5220
                    Seattle, WA 98101-1271
 6                  Phone:  206-553-4299
                    christina.fogg@usdoj.gov
 7

 8         For the Plaintiff:

 9                  MR. ARNOLD WILLIG
                    MR. CHARLES L. BUTLER
10                  HACKER & WILLIG PS
                    520 Pike Street, Suite 2500
11                  Seattle, WA 98101
                    Phone:  253-340-1935
12                  arnie@hackerwillig.com
                    charlie@hackerwillig.com
13
                    and (telephonically)
14                  MR. LAWRENCE J. FREEDMAN
                    MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO
15                  701 Pennsylvania Avenue N.W., #900
                    Washington, DC 20004
16                  Phone:  202-434-7372
                    ljfreedman@mintz.com
17

18         For the Creditors Committee:

19                  MS. JANE PEARSON
                    FOSTER PEPPER PLLC
20                  1111 Third Avenue, Suite 3400
                    Seattle, WA 98101-3299
21                  Phone:  206-447-4400
                    pearj@foster.com
22

23         For the Dept. of Health and Human Services:

24                  MS. JANET FREEMAN

25
```

AHEARN & ASSOCIATES
ahearnandassoc@comcast.net

```
 1            DIGITALLY RECORDED IN SEATTLE, WASHINGTON

 2                        AUGUST 28, 2014

 3                           --ooOoo--

 4

 5            MS. FOGG:  Good afternoon, Your Honor.

 6      Christina Fogg for the federal defendants.

 7            MS. FREEMAN:  And Janet Freeman on behalf of

 8      Health & Human Services.

 9            MR. WILLIG:  Arnie Willig on behalf of

10      Natural Molecular, the plaintiff in this adversary

11      proceeding.

12            MR. BUTLER:  And Charlie Butler, also on

13      behalf of Natural Molecular.

14            MS. PEARSON:  Jane Pearson on behalf of the

15      committee.

16            THE COURT:  All right.  And remind me, did

17      the committee file a pleading on any of these?  I know

18      you had your own motion, which you continued.

19            MS. PEARSON:  We had our own motion which

20      we continued, Your Honor.  And I simply wanted the

21      opportunity to make a brief statement indicating the

22      committee's support of the State's efforts in this

23      regard.  Just to let the Court know, that one of our

24      concerns, with respect to the future of the case, has

25      to do with, ultimately, how some of these may play out.
```

1      So we're keenly interested and thought the trustee's

2      motion might be well considered later after the outcome

3      of these cases.

4              THE COURT:  All right.  I'll allow to you

5      make a limited statement.

6              MS. PEARSON:  Thank you.

7              THE COURT:  All right.  Let's go back to what

8      -- first let me list what I have in motions and confirm

9      that I'm not missing anything, and then discuss how I

10     want to hear them.  So I have a, in essence, renewed

11     motion to dismiss, but on the amended complaint.  I

12     have the new motion to abstain or stay adversary

13     proceeding.  Third, I have a motion to stay discovery

14     pending resolution of the motion for judgment on the

15     pleadings.  And fourth, I have a motion for protective

16     order seeking to limit discovery to what discovery

17     would be if it were an administrative proceeding.  And

18     that's it, right?  Did I miss anything in there?

19             MS. FOGG:  That's correct, Your Honor.

20             MR. FREEDMAN:  Your Honor, do you want

21     telephone appearances by counsel as well?

22             THE COURT:  I did, yes.  Go ahead.

23             MR. FREEDMAN:  Yeah, I apologize.  Larry

24     Freedman for Natural Molecular, by phone.

25             THE COURT:  All right.  Thank you.

1          MR. DREW:  And also, Your Honor, Richard Drew

2     from the Department of Justice.

3          THE COURT:  All right.  Are either of the

4     counsel on the phone going to be arguing any of the

5     motions?

6          MR. FREEDMAN:  This is Larry Freedman.  No,

7     Your Honor, I don't intend to.  I'm there to

8     supplement, if necessary.

9          MR. DREW:  Your Honor, it's the same for me.

10          THE COURT:  All right.  Let's chop them in

11     this order.  I'm going to hear the motion to abstain or

12     for stay, then I'll hear the renewed motion for

13     judgment on the pleadings -- or in essence, what I'm

14     construing as renewed motion for judgment on the

15     pleadings -- and then I will hear the two discovery

16     related motions.

17          So let's hear the -- as a standalone motion,

18     let's hear the motion to abstain or stay proceedings.

19          MS. FOGG:  Sure, Your Honor.  I would start

20     by saying, I would like to apologize for overwhelming

21     the Court with four briefs.  It was not meant to be a

22     burden.  It was brought in this way because, as Your

23     Honor has noted in the past, it is a very unique

24     circumstance that we find ourselves in, and it is an

25     issue of great importance and precedent to the agency

1    and gets to the very relationship between the agency

2    and the courts.  There are also significant practical

3    concerns at issue, and it was our hope that through

4    these four motions, we could present a number of

5    options to the Court that the Court could choose from

6    with due consideration to all of those interests.

7         THE COURT:  And speaking of options, what is

8    the status of the motion to withdraw the reference?

9         MS. FOGG:  As far as I know, it has been

10   fully referred to the district court.  It was noted for

11   August 22nd, but we have not heard anything further

12   since that time.

13        THE COURT:  Do you know who it's been

14   assigned to?

15        MS. FOGG:  I believe it's been assigned to

16   Judge Lasnik.

17        THE COURT:  All right.  Go ahead.

18        MS. FOGG:  Your Honor, the motion to abstain

19   or defer decision until after agency action was brought

20   in part at the suggestion of this Court for our last

21   hearing.  It relates to the issue of even if this Court

22   finds that Town and Country provides that this Court

23   can exercise jurisdiction in this case, the question is

24   whether or not it should and whether or not it's

25   practical and helpful to all of the parties and this

1      Court for it to do so.

2              It's our position -- as we set forth in the
3      pleadings -- that because this involves such a
4      technical and complex issue of Medicare reimbursement
5      disputes, that it is better decided in the first
6      instance by the agency that has the processes, the
7      expertise, and the experience to do that.

8              If Your Honor is looking for an example of
9      what would be involved in the decision in the first
10     instance, I would refer you to the Exhibit A to the
11     reply in support of abstaining, which attached the
12     national and local coverage determinations that would
13     make up just one part of what would have to be decided
14     in the first instance, in other words, whether or not
15     each of these claims met those requirements.

16             In addition, if the Court does not choose to
17     abstain, there are a number of problems that it will
18     pose.  First, there is a risk of duplicate effort.  The
19     agency is moving forward with its first level review.
20     It has gotten through Universe 1 in its entirety and
21     has produced those results to NMTC.  And those efforts
22     continue with respect to the other universes.  This
23     Court would be, in essence, duplicating that effort by
24     trying to also decide, in the first instance, the
25     coverage determination.  There is also, inherent in

1     that, a risk of inconsistent judgments if the agency

2     reaches one determination and this Court reaches

3     another.

4              But perhaps most significantly, there is the

5     problem of there not being a plan or precedent for how

6     this would be adjudicated in the first instance.  And

7     in fact, I thought it was telling that NMTC's own

8     proposal in their response requires this Court to rely

9     upon the administrative record findings.  In their

10    opposition at page 8, they said the bankruptcy court

11    need only review AdvanceMed's final report and apply

12    the law.  They're essentially conceding that this Court

13    would not need to do a first level review and are not

14    suggesting that the Court should.

15             For that reason, abstention to March 6th is

16    warranted, because that is when we can represent that

17    all of the universes will be decided by an initial

18    determination at that time.  Right now we only have

19    Universe 1 completed.  I'm not sure if this is what

20    NMTC was arguing, but it seemed to me that in their

21    response they were arguing that we could somehow take

22    Universe 1 and extrapolate that out to the other

23    universes.  I don't think that that is possible.  Each

24    universe has its own distinct claims, patients, and

25    medical circumstances.  And I think we need all of the

1     universes to be complete in order to have a first level

2     review to move forward from.

3          THE COURT:  Let me ask -- I think you

4     answered this last time, but I've forgotten the answer.

5     Universe 1, the time frame for that is early enough

6     that you still have later claims that haven't had

7     review completed yet that are relevant to your claim,

8     as opposed -- the claim is based on what you've paid --

9     the Government's paid out already.  At some point the

10    Government quit paying out, so then later claims after

11    that aren't really relevant to the claim determination.

12    They're only relevant -- I mean, they would be relevant

13    to the plaintiff debtor's claims, but they wouldn't be

14    relevant to the claim determination.

15         But am I correct, Universe 1 isn't the

16    universe, the complete universe, for those claims that

17    have to be reviewed for the claim determination; is

18    that correct?

19         MS. FOGG:  I believe that's correct.  That's

20    something I was clarifying just moments ago, and Janet

21    can correct me if I'm wrong.  But my understanding is

22    that our claim 83 -- which currently represents the

23    unliquidated, undecided claim based on this

24    reimbursement dispute -- there are four universes of

25    claims within that.  The first two are ones that were

1      already paid out to NMTC.  And the issue is whether or

2      not it was an overpayment.  Universes 3 and 4 are

3      predominantly ones that are currently held in suspense.

4      So they have not been paid out.  So I believe Your

5      Honor's characterization is correct.

6              THE COURT:  Okay.  So the claim -- you have

7      two claims.  The claim for the $8 million, is that all

8      within Universe 1?

9              MS. FOGG:  Yes.

10             THE COURT:  Because otherwise, how could you

11     claim it, right?

12             MS. FOGG:  Correct.

13             THE COURT:  Do you know what that claim

14     number is?  Just so I can keep these straight.  Were

15     they sequential --

16             MS. FOGG:  Sure.  So 82 is the fully mature

17     liquidated claim.  Claim 83 is the unliquidated claim

18     that represents this active Medicare payment dispute.

19             THE COURT:  Okay.  So I know you have your

20     other arguments, including jurisdictional, but in fact,

21     from the Government's side, what claim review needs to

22     be done for adjudication of what you called your fully

23     mature claim has been completed; is that right?

24             MS. FOGG:  That's right.

25             THE COURT:  Okay.  Go ahead.

1          MS. FOGG:  The other issue I wanted to

2      address in terms of seeking our relief for either

3      abstention or at least a deferral until March is the

4      claims from NMTC that this would be unfair because of

5      the delay that it would cause.  I would note that,

6      first, NMTC has not provided a viable faster

7      alternative for resolution.  In fact, their plan for

8      resolution also relies on the administrative record,

9      which would take until March to develop.

10          In addition, I wanted to note that Medicare

11      is a voluntary program, that participants know that

12      they're going to be subject to a variety of rules and

13      regulations.  And they know that if there are credible

14      allegations of fraud, their claims will be held in

15      suspense.  The Supreme Court has already weighed the

16      importance of the agency's careful review of Medicare

17      disputes against the delay that that process can cause

18      and has already found that careful review by the agency

19      is a more important virtue than that delay.

20          That is true even in the bankruptcy context.

21      There's case law that we cited in our brief that

22      includes the fact that providers who choose to

23      participate in Medicare do not have a guarantee of

24      solvency.  That's especially true here where it is now

25      our understanding that NMTC is not reorganizing.  They

1      are liquidating.  By their claim -- or by, rather,

2      their pleading filed in the bankruptcy court at docket

3      number 351, on page 2, they state this they expect to

4      file a liquidating plan and/or motions to dispose of

5      the estate assets for the benefit of creditors to wind

6      down the affairs of the business and to liquidate

7      assets.  So in this instance, delay is even more

8      insignificant.

9              In sum, Your Honor, abstention or deferral to

10     agency expertise is the most efficient way to move

11     forward to resolve this highly technical issue of

12     Medicare reimbursement eligibility.

13             That's all I have on this motion.  I'm happy

14     to address the other ones if you like.

15             THE COURT:  No, let's take them one at a

16     time.  Okay.  Thank you.

17             MR. WILLIG:  Thank you, Your Honor.  Arnie

18     Willig on behalf of the plaintiff, Natural Molecular.

19     I think that when you look at this case over all and

20     you realize that the Government suspended these funds

21     back in April of 2013, more than 18 months ago, they've

22     had plenty of time to do whatever sort of analysis or

23     claims review or internal probing of whether or not

24     these claims were medically necessary to fit in with

25     the current trial calendar that we have right now.

1         What they're really doing is essentially

2    gaming this system by saying this Court should not hear

3    any of these claims because we've come up with these

4    imaginary horribles.  The Court's going to have to

5    listen to 17,000 claims and review medical records of

6    individuals who are part of the Medicare program.

7         In fact, that's not what this case was about

8    originally.  The case was filed because the Government

9    stated that there were credible issues of fraud with

10   respect to -- I believe they pulled out at the time --

11   five files.  Since then it has now morphed into this

12   claim that these tests were medically unnecessary and,

13   therefore, not reimbursable.  And now as the case

14   evolves, they're saying, well, we need yet more time in

15   order to essentially develop our case in secret without

16   having the review of a litigant to the matter so that

17   we can examine whether or not what they're doing

18   comports with the claims that we've brought against

19   them.

20        The Government has been ordered, as of July,

21   to compel production of their documents.  What they've

22   produced was, frankly, woefully incomplete.  And if I

23   can hand up to the Court a brief summary, we received

24   -- after the motion to compel, we received -- if I

25   might hand this up to the Court, Your Honor?

1           THE COURT:  You may.

2           MR. WILLIG:  -- hundreds and hundreds of

3    pages of spreadsheets of this nature that are virtually

4    unreadable and really say nothing as to the nature of

5    the Government's dispute with these Medicare claims.  I

6    mean, what the Government is doing is essentially

7    forcing this debtor into filing yet another motion to

8    compel production to say, we're here to get to the

9    bottom of why you're disputing these claims.  We're not

10   here to be papered with useless spreadsheets that are

11   unreadable and then cast aspersions on the debtor by

12   saying, well, they knew that this was a voluntary

13   process, and they should follow the administrative

14   rules.  I know we're kind of overlapping into a later

15   argument.

16           But the Ninth Circuit in Town and Country has

17   said this court has jurisdiction to hear this matter.

18   And that is still good law, and that's what we're

19   following.  And that's what the Court should apply in

20   hearing this adversary.

21           THE COURT:  All right.  Thank you.  All

22   right.  Let's move on to the motion for judgment on the

23   pleadings.

24           MS. FOGG:  Thank you, Your Honor.  And I'm

25   happy to address those issues as well.  I don't know if

1        you want me to spend any time in rebuttal before I move

2        on to the next --

3                THE COURT:  Well, I don't need you to address

4        the issues regarding discovery because there's not a

5        motion to compel in front of me right now.

6                MS. FOGG:  Okay.  So on the 12(c) motion for

7        judgment on the pleadings, Your Honor --

8                THE COURT:  I guess the focus would be, I can

9        understand why you would do this for preserving your

10       record, if you will.  Is there anything extra on top of

11       it that is really uniquely raised by the amended

12       complaint that I should hear about?

13               MS. FOGG:  We tried to make it not too

14       terribly boring for you to read a second time through.

15       There is a new focus of this motion for judgment on the

16       pleadings that I think was not as focused upon in the

17       original motion, which is not so much the issue of

18       whether or not Town and Country is good law or well

19       reasoned.  It is the issue that Town and Country is

20       distinguishable from the circumstances here.  And it's

21       distinguishable in a way that is very significant to

22       the issues we're talking about.

23               Town and Country involved a Medicare

24       reimbursement dispute that had already been resolved.

25       The issues was that that was going to be paid through a

1    promissory note and how that promissory note should

2    play in the bankruptcy.  It's a very different

3    situation from here where the very essence of what

4    we're deciding in this adversary is whether or not the

5    amounts are properly payable under Medicare.  And there

6    are reasons why that is an issue better left to agency

7    administration than --

8         THE COURT:  But is there anything within the

9    Ninth Circuit's decision itself that said that was

10   critical to its decision?  Any reason why it's saying

11   exhaustion would otherwise apply if it was this

12   original determination, but it doesn't now?  Or are you

13   just saying that that's a logical distinction with the

14   facts?

15        MS. FOGG:  It is a logical distinction, but

16   also it's difficult to get into the reasoning of the

17   court since it was put in, essentially, two lines at

18   the end of the decision.  The decision primarily

19   focused on the issue of sovereign immunity, which is

20   not what is being argued here.  So they gave us very

21   little record to work from.  But from my perspective,

22   it relied on the issues of that case.  And that case

23   did not have a Medicare payment dispute.  It just had

24   an issue that touched upon Medicare, which I believe to

25   be different.

1          THE COURT:  All right.  Thank you.

2          MR. WILLIG:  Thank you.  Again, if the

3     Government had an issue with the Court's previous

4     rulings with respect to its denial of their motions to

5     dismiss, they could have filed a motion for

6     reconsideration and brought out what they considered to

7     be these new facts or distinguishable facts in Town and

8     Country that they're now bringing forth today.

9          The fact of the matter is there's nothing

10    distinguishable in Town and Country today versus back

11    then.  Town and Country is very clear.  The case states

12    that the exhausting provisions of the Medicare Act and

13    the Federal Tort Claims Act have no bearing on Town and

14    Country's claims because the independent grant of

15    jurisdiction to the bankruptcy courts set forth in 28

16    USC 157 and 1334, as well as the waiver of sovereign

17    immunity contained in 11 USC 106.

18          Now, Town and Country standing alone grants

19    jurisdiction to this Court to hear these Medicare

20    claims.  Further, another independent source of

21    jurisdiction is the fact that the Government has

22    admitted that it filed two proofs of claim.  Under the

23    Hong Kong-Shanghai Bank v. Simon case, again, another

24    -- which is 153 F.3d. 991 -- that served as another

25    independent bases for jurisdiction of this Court to

1    hear those claims.  What the Government is trying to do

2    is say, well, that deals with the sovereign immunity

3    issue, and sovereign immunity is different than

4    jurisdiction.  But in fact, they're one and the same.

5            This Court, under Town and Country, has

6    jurisdiction to hear Medicare claims.  The Government,

7    filing its proof of claim, is essentially doing two

8    things, consenting to the jurisdiction of this Court

9    and waiving sovereign immunity.  But the Government's

10   argument is is, well, we can waive sovereign immunity,

11   but this might not be the proper forum to hear that

12   dispute.  It might be our administrative review process

13   that Medicare has set up.  But that's not what the law

14   is.  The law is this Court has jurisdiction and can

15   hear this adversary in its entirety.

16           And I suppose, to get back to the

17   administrative review process, that alone takes months

18   and months.  I mean, right now it would take, from my

19   understanding, 26 weeks to get on the docket of an

20   administrative review court or panel before it would

21   even set a trial date.  So we're talking years --

22   effectively, years and years into the future from when

23   the Government first suspended these Medicare payments.

24           The fact of the matter is is, the Government

25   broke this debtor's back by failing to pay it its $15

1     million in receivables.  Now what they're doing is

2     saying, well, the debtor might be filing a liquidating

3     plan, but it was -- the reason that the debtor's in

4     this spot today is because it is effectively cut off of

5     all payments by Medicare.  And that's what we're here

6     to determine, whether or not the Government owes that

7     $15 million to this debtor, and whether or not there

8     are other damages with respect to the Government's

9     essentially destroying this debtor's business

10    operations.

11         Your Honor, there's no reason to again

12    revisit this issue of jurisdiction.  It's been raised,

13    I think, by my count, this is the fourth time we've

14    been here on this issue.  The Ninth Circuit case of

15    Town and Country has not been overruled since then.

16    And again, the Government has filed its proof of claim

17    -- or two proofs of claim, thereby consenting to this

18    Court's jurisdiction.

19         THE COURT:  All right.  Thank you.  Let's

20    hear the motion to stay discovery pending my ruling on

21    motion for judgment on the pleadings first.

22         MS. FOGG:  I'm sorry, Your Honor.  Could you

23    say that again?

24         THE COURT:  Yes.  Let's hear your motion to

25    stay discovery pending final resolution of motion for

1    judgment on the pleadings.

2              MS. FOGG:  Thank you, Your Honor.  So this

3    motion was brought prior to the motion to compel that

4    this Court decided during the last hearing.  It's

5    continued significance is, one, it is another option to

6    the Court in terms of dealing with some of the problems

7    presented by this case.  One thing I wanted to clarify

8    from when this issue was discussed in terms of the

9    motion to compel was that this Court, at that point,

10   ruled that -- you know, ordinarily, if there is a

11   dispute about jurisdiction, there are grounds to

12   potentially stay discovery so that there is not

13   prejudice to one of the parties while that

14   jurisdictional dispute is going forward.

15             In this instance, the Court said that because

16   there would be discovery -- or at least this is my

17   understanding of the Court's ruling -- is that because

18   there would be discovery with respect to claim 82, that

19   regardless of whether or not this Court or the agency

20   went about deciding claim 83, the Government would

21   still need to participate in discovery because of claim

22   82.  And I just wanted to note that that is not the

23   case, because claim 82 represents a fully matured and

24   final decision by the agency that was not appealed by

25   NMTC.  The only thing this Court would be deciding with

AHEARN & ASSOCIATES
ahearnandassoc@comcast.net

1    respect to claim 82 is its priority status and its

2    administration in the bankruptcy.  So discovery would

3    not be necessary or allowed.

4         So there is a prejudice to the Government in

5    having to proceed with discovery while these

6    jurisdictional issues are being decided.

7         THE COURT:  All right.  Let me hear from

8    plaintiff's counsel.

9         MR. WILLIG:  Thank you, again, Your Honor.

10   If the Government had an issue with respect to

11   producing documents or complying with discovery, the

12   time and place for that was prior to us serving them

13   with the discovery and bringing the appropriate motion

14   for either protective order or, in this instance, its

15   request for a stay.

16        We've served our discovery shortly after the

17   amended complaint was served, which I believe was

18   sometime in early June.  We then gave the Government an

19   extension of time to respond to that discovery.  On

20   practically the eve of its required production,

21   pursuant to this Court's order, it essentially called

22   my office and said they were only going to produce

23   documents that a claimant would get during the course

24   of an administrative hearing, period.  Now, they didn't

25   bring that up to the Court beforehand or by way of a

1          protective order.  And essentially what they're doing

2          is asking for that today, and then also saying --

3                    THE COURT:  But the only one you're arguing

4          right now is the overall -- is the total stay request

5          pending this now new motion for judgment on the

6          pleadings.  The next motion will be the one you're

7          starting to argue.

8                    MR. WILLIG:  Well, again, these were issues

9          that should have been properly brought up during the

10         pretrial conferences when we're establishing the

11         deadlines for trial and before we're setting out our

12         own discovery and developing our own deposition

13         schedules for the Government's witnesses.

14                   At this point, no purpose is served by

15         delaying these proceedings any further.  Jurisdiction

16         has been established by this Court.  The Court is the

17         proper forum to hear these claims.  And delay only

18         serves to benefit the Government and act to the

19         detriment of this debtor, because no claimant -- no

20         other class of claimants is getting paid.  And either

21         the Government has a basis for withholding these $15

22         million in funds, or it does not.  It shouldn't be

23         entitled to a victory simply through attrition and

24         continuing the case and continuing these deadlines

25         month after month after month, while the other parties

1      in this case effectively suffer.

2           This is the main asset for this case, the

3      recovery of these Medicare funds.  We shouldn't put,

4      essentially, this entire ase on hold while an issue

5      that has already been raised countless times by the

6      Court is heard again.  So there's no reason for a stay

7      of these proceedings whatsoever.

8           THE COURT:  All right.  Thank you.  Now let's

9      hear argument on the motion for protective order.

10          MS. FOGG:  Thank you, Your Honor.  I do want

11     to start by noting the issue about that we could have

12     moved for reconsideration.  The initial decision on the

13     initial motion to dismiss is not --

14          THE COURT:  It doesn't really matter.  I

15     think you almost had to do what you did to preserve the

16     record.  I understand.

17          MS. FOGG:  Thank you, Your Honor.  I just

18     wanted to clarify that.  The motion on the protective

19     order assumes that this case proceeds as it currently

20     is and attempts to decide what discovery should occur

21     and how.  Our motion relates to the legal and equitable

22     reasons why discovery should be limited to the

23     administrative record.  The legal reason is that every

24     other Medicare payment dispute has been decided using

25     the administrative record.  And departing from that

1   standard would not only be unprecedented, but it would

2   also create a significant difference between the claims

3   being heard in this court and them being heard in the

4   usual process of agency administration.

5           THE COURT:  So for this motion, it's

6   important for me to get a better understanding of what

7   discovery would occur in the administrative proceeding.

8   The characterization, as I took it -- and I may be

9   mischaracterizing it -- from the plaintiff is,

10  basically, they wouldn't get any discovery in the

11  administrative proceeding, at least at this juncture.

12          MS. FOGG:  It's a little bit of a difference

13  in the terms.  They wouldn't get discovery, per se, but

14  think would be given the letter and the findings and

15  the supporting documentation for what the agency had

16  reviewed.  So they --

17          THE COURT:  Once the agency has reviewed it,

18  though.  But until anything but Universe 1 has been

19  reviewed, they'd get bupkis, right?

20          MS. FOGG:  They've already gotten some things

21  that are beyond the administrative record, and they

22  have gotten the findings and the supporting

23  documentation for claim 82 and for Universe 1.  But

24  you're correct that they have not received anything

25  about Universes 2 through 4 because there's nothing to

1     produce at this time.  Those are what are being worked

2     on.

3          THE COURT:  Okay.  Go ahead.

4          MS. FOGG:  Our motion relies in part on the

5     quote from Butner v. United States, which is the

6     Supreme Court case, saying that there is no reason why

7     interest should be analyzed differently simply because

8     an interested party is involved in a bankruptcy

9     proceeding.  And that is the case here.  It would

10    create bad incentives for there to be more discovery,

11    more delving into the agency's processes, and

12    potentially forum shopping if they were allowed to do

13    this instead of what they would normally get if they

14    just happened to not be in bankruptcy.

15         The other issue is the equitable issue, which

16    is that NMTC is seeking civil discovery of all of these

17    issues, and also the benefits of the agency proceeding.

18    Under the normal agency review, the agency takes on a

19    burden that it would not ordinarily have to.  The rule

20    is that in order to be entitled to repayment under

21    Medicare, the burden is on the claimant to demonstrate

22    their entitlement to that payment.  If we were not in

23    the agency review process, that would mean that the

24    service provider would need to come forward before the

25    Court and show the basis for meeting all of the

1    Medicare rules and requirements, looking at the charts

2    of the patients at issue, looking at the FDA trials

3    that are going on, comparing all of those against the

4    rules that Medicare has for what is covered and what is

5    not.

6         What the agency takes on voluntarily, as a

7    burden during the normal agency review process, is to

8    go out and proactively collect those documents, cull

9    through them to the relevant parts.  They hire a

10   medical staff to do that, to interpret diagnoses codes

11   and to come up with a decision that represents what

12   they have seen in that record.  That would not be

13   available to them in the normal course.  And that is

14   what NMTC is essentially asking for, both the benefits

15   of that process and then beyond that for their civil

16   discovery.

17        I'd also note that NMTC has not suggested any

18   plan for how that would occur.  Their plan in their

19   response is to use the administrative record that has

20   already been decided to move forward.  I haven't heard

21   any explanation for how else we would go about doing

22   that.  If that is what they want and need to prove

23   their case, there's certainly no harm in limiting them

24   to that, and they have not identified any harm.

25   Anything that they need to prove their case, it would

1      not be part of the administrative record.

2           They have noted the issue of fraud.  It's

3      worth explaining that the way the agency system works

4      is that when there's a credible allegation of fraud,

5      that is essentially a red flag that starts the process

6      of looking through claims for eligibility.  But it gets

7      split into two separate tracks.  So the OIG's office

8      actually reviews the fraud, and there is a criminal

9      investigation, an OIG investigation, going on with

10     respect to that fraud that this part of the case has

11     nothing to do with.

12          Fraud is just the thing that instigates the

13     looking into the eligibility of each of the claims, and

14     that's what we're talking about here.  So that's why

15     questions about fraud and the discovery about fraud

16     would not only be irrelevant, but they would also

17     implicate a lot of privileges and other protections

18     that we would have to litigate and decide -- which we

19     would not have to litigate and decide if we were just

20     limited to the administrative record, which I believe

21     is what both parties have suggested is needed here.

22          THE COURT:  All right.  So but, in essence,

23     what you're saying there is if I were to deny your

24     motion overall, you'd be coming back and asking for a

25     protective order as to any requests to OIG or regarding

1    the fraud investigation.

2         MS. FOGG:  Among other things.  It would also

3    have the additional burden of -- they've asked for

4    things like email communications between the various

5    contractors and groups.  That would require collecting

6    all of those email communications.  And then there are

7    things like, you know, we've looked at one that was a

8    nurse listing, among her different cases that she's

9    working on, this case as one of them, and then other

10   cases that, you know, involve other areas of fraud and

11   other investigations.  It would mean going through all

12   of those thousands of emails and culling out the ones

13   that are potentially relevant, not protected by the

14   attorney/client privilege, and not related to the fraud

15   or other irrelevant issues.  That would time consuming,

16   and it would also require further litigation.

17        THE COURT:  All right.  Let me hear from

18   plaintiff.

19        MR. WILLIG:  Your Honor, I'm not quite sure

20   what the Government's -- what we're asking for here is

21   the discovery that we're entitled to under the civil

22   rules and, frankly, under the rules of evidence.  We're

23   not asking for two tracks saying, give us the

24   administrative record, and then give us everything that

25   we're entitled to under the civil rules.  We're saying,

1    give us everything that supports your claims -- like we
2    do in any other type of trial -- and if you don't have
3    those documents, say so.  If you do, then produce them.
4          The Government shouldn't be entitled to a
5    protective order because it believes that the record in
6    this case or the discovery in this case should be
7    limited.  What they're essentially asking for is to
8    say, okay, even though this Court has jurisdiction and
9    it's going to hear this claim, we want this Court to
10   apply the rules that would be in effect if this was an
11   administrative proceeding.
12         The fact of the matter is, there is no
13   administrative proceeding pending.  All we have is the
14   Government saying, we're suspending these funds.  On
15   Natural Molecular's side, they're saying, we want to
16   know why you're suspending the funds and whether or not
17   that suspension is proper or not.  Because if it's not
18   proper, release the funds.
19         Again, the Government is trying to make this
20   case seem much more arduous and much more complex than
21   it really is.  Whether or not Natural Molecular was
22   complying with the Medicare requirements in submitting
23   its invoices, those are very triable issues.  Those are
24   very provable issues.  Whether or not these tests were
25   medically necessary or not, again, those are issues

1     that can easily be heard during the course of trial.

2          Whether or not the Government is reimbursing

3     other lab providers for this exact same type of service

4     is also very relevant to this case.  Whether or not the

5     Government's motivation is simply to say, we've got a

6     lab that's down on one knee and we want to end its

7     existence and not have to pay it $15 million, that's

8     another issue that will be explored at trial.

9          But to at this point say the Government wants

10    a protective order simply to produce documents, as

11    we've -- the Court's already seen, hundreds and

12    hundreds and hundreds of pages of unreadable

13    spreadsheets, and then say that that's what Natural

14    Molecular should be limited to is not what the rules

15    provide.  The rules state that they have to come forth

16    with all of their discovery.  And if they think that

17    something should be protected, we're happy to agree to

18    -- and already have agreed to -- limit communication

19    that might affect their other ongoing investigation.

20    In fact, I think we've done that informally, and an

21    order to that effect has been entered.

22         There's no further -- there's no reason to

23    take this motion for protective order and use it to

24    limit discovery.  That's not what it's for, and the

25    Government has not articulated a reason why that should

1        be the case.

2                THE COURT:  All right.  Thank you.  I have

3        some questions, and they sort of overlap various of the

4        motions, but mainly are germane to the abstention

5        motion, I think.  But they overlap somewhat.  I need a

6        better sense of just what is in -- as I understand it,

7        the Government has, in its mature claim, fully mature

8        claim, has, as to Universe 1, claimed reimbursement of

9        every dime it's paid on those reviewed claims to

10       Natural Molecular.  Is that correct?

11               MS. FOGG:  I think the phrasing is slightly

12       off.  Universe 1 is part of claim 83.

13               THE COURT:  Oh, it is.

14               MS. FOGG:  Yes.

15               THE COURT:  Okay.  So what's -- but claim 82

16       is the fully matured one, isn't it?

17               MS. FOGG:  Correct.

18               THE COURT:  Okay.  So I assume those claims

19       have been reviewed?

20               MS. FOGG:  Yes.

21               THE COURT:  Okay.  But it's not in any of

22       what you call the universes.

23               MS. FOGG:  That's right.

24               THE COURT:  Okay.  So then besides the

25       universes you're calling universes, there is a universe

1           that you've already reviewed all of those claims.

2                   MS. FOGG:  Yes.  And I'm sorry for the

3           terminology.  But yes, claim 82 was before this dispute

4           started, or started in earnest, had been fully

5           reviewed.  There had been an agency determination that

6           was not appealed in the time frame that it would have

7           needed to be.

8                   THE COURT:  So it it used to be a universe,

9           but now that you've reviewed it, it's no longer a

10          universe?

11                  MS. FOGG:  That's right.  It's outer

12          universe.

13                  THE COURT:  All right.  Outer universe.  I

14          like that.

15                  MS. FOGG:  Okay.

16                  THE COURT:  So as to the outer universe, was

17          there not a single claim that Medicare believed was

18          valid?

19                  MS. FOGG:  That I don't know.

20                  MR. WILLIG:  Our understanding is there was

21          not.

22                  MS. FOGG:  Okay.  I believe there were not

23          any that were allowed.

24                  THE COURT:  Okay.  So give me a flavor of why

25          they were disallowed.  I mean, I know the example that

1    had been raised before of just, they weren't asked for

2    by the doctors or they weren't in the category that was

3    covered.  But I guess I'm kind of perplexed how a

4    seemingly sophisticated entity that does this genetic

5    testing got every single one wrong and didn't make one

6    claim that was an allowable claim.

7            MS. FOGG:  Well, it's done on a sampling

8    basis.  So it's not that each individual claim is

9    reviewed.  It is a -- there's a methodology that's been

10   developed and approved by courts where --

11           MR. DREW:  Your Honor, I'm very sorry.  This

12   is Richard Drew.  I just want to keep us from getting

13   confused.  But claim 82 is composed of, I believe, 241

14   individual claims totaling about $66,000, whereas claim

15   83 is about the ongoing administrative proceeding that

16   involves over 100,000 claims and amounts to millions

17   and millions of dollars.  So I mean, claim 82 involves

18   individual determinations for people's claims, whereas

19   claim 83 involves sampling from well over 100,000

20   claims.

21           THE COURT:  All right.  But my understanding

22   was claim 82 was $8 million.

23           MR. DREW:  No, no, no.  Claim 82 is $66,000,

24   Your Honor.

25           THE COURT:  Oh, it is.  Okay.  What's the $8

1    million?

2              MS. FOGG:  Universe 1.

3              MR. DREW:  Claim 83.

4              MS. FOGG:  Claim 83.

5              THE COURT:  Okay.  So even though it is

6    unliquidated and might be more than that, it's at least

7    $8 million?

8              MS. FOGG:  It's that it is part of the

9    unliquidated group, which is the four universes.  But

10   since this has all started, and since the filing of

11   claim 83 as an unliquidated claim, it has been -- it's

12   had its initial determination.

13             THE COURT:  Okay.  So it's now partially

14   liquidated.  You haven't amended the claim to reflect

15   it, but --

16             MS. FOGG:  That's right.  But there's also,

17   potentially, appeals rights to NMTC for that.  So I'm

18   not sure it can be considered final in the same way

19   that claim 82 is.

20             MR. FREEDMAN:  Your Honor, this is Larry

21   Freedman, if I may, for Natural Molecular.  This points

22   to the crux of the whole problem, which is NMTC has no

23   right to appeal the $8 million, has no way to get

24   information about this, apart from what's been parceled

25   out to it, and simply -- as Mr. Willig has pointed out

1       -- simply wants normal, civil discovery to understand

2       whether it's entitled to the $8 million or whether

3       there's a basis for the NMTC to keep it.  And the only

4       way to do that is through the adversary proceeding,

5       that we can figure out.

6              MR. DREW:  Your Honor, this is Richard Drew.

7       That's entirely false.  They have the right to --

8              THE COURT:  I'm glad you agree.

9              MR. DREW:  They have the right to --

10             THE COURT:  So let me slow you down for a

11      minute.  This all started by the Court's colloquy, and

12      I really do want an answer to my question.  What I'm

13      really trying to understand is, at its heart, what is

14      going to be involved in this litigation.  Because one

15      of the options that really hasn't been presented as a

16      separate option that's on the table -- and certainly

17      could all be trumped in a heartbeat by a full grant of

18      the motion to withdraw the reference -- but I have the

19      jurisdiction to render a final adjudication as to the

20      claims matters, as opposed to the claim-over.

21             The claim-over, it could be referred back

22      down to me to handle everything up to trial.  But

23      absent consent by the Government, I'm not going to be

24      hearing the claim-over when it actually gets to trial.

25      There's no disagreement on that jurisdictional aspect,

1          I don't think.  And that's setting aside the

2          Government's other jurisdictional arguments and the

3          possibility of a reverse field on Town and Country and

4          all of those issues.  I'm just saying, broad brush, I'm

5          trying to get to an understanding of this.  I heard the

6          trial on the pure claims issues.  Does it, in fact,

7          though -- would I be making rulings on the exact same

8          issues that are going to cut across the rest of the

9          field here?

10             MS. FOGG:  Yes.

11             THE COURT:  Okay.  And what are those issues?

12             MS. FOGG:  If I'm understanding the question

13          correctly --

14             THE COURT:  Because what I'm still not

15          understanding is how each and every one of this

16          entity's claims could be false and wrong and not

17          payable.

18             MS. FOGG:  So the claim 83, as Richard

19          pointed out, represents millions of claims that are

20          separated into four universes by chronology.  They will

21          be reviewed using a sampling methodology.  So if

22          they're -- once they're decided by the agency, it will

23          be on a sampling basis.  And what normally happens in

24          the agency review process is then NMTC has an

25          opportunity to, you know, take issue with certain

1       aspects of the sampling and whether or not the ones

2       that were sampled were good samples or not.  And that

3       ends up being the dispute.

4              Here, my understanding is that they are

5       asking for a complete displacement of the agency

6       process and to be able to just present to Your Honor

7       why they're entitled --

8              THE COURT:  Right.  But it's not answering my

9       question.  My question is a factual one.  It's just

10      what is the nature -- what's the specifics of the basis

11      why any of these samples were booted out as not being

12      payable?

13            MS. FREEMAN:  Do you want me to explain?

14            MS. FOGG:  Sure.  May I have Ms. Freeman --

15            THE COURT:  Yes, please.

16            MR. FREEDMAN:  Your Honor --

17            THE COURT:  Counsel, for a minute, hold on.

18      I'm just trying to explain why I'm asking the question

19      so I can get a better answer to the question.  One of

20      the options in front of me is abstention, but one of

21      the options that is more fully in my control is going

22      ahead with claims issues at trial.  I'm trying to

23      understand what is really in play here, what's the

24      nature of the evidence of -- not all of what's

25      necessary to establish Medicare claim or a right to

1    repayment, but literally what's the dispute between the

2    parties, what is the nature of the reason that Medicare

3    booted these claims out.

4         MS. FREEMAN:  And thank you, Your Honor, for

5    letting me explain.  I think this underscores how

6    complicated this can become.  Claim 82 is separate from

7    claim 83 as follows.  Claim 82 is generated through

8    what's called a recovery program audit.  And what that

9    means is when these claims are processed through this

10   huge system, the Medicare administrative contract or

11   system will catch claims simply through the system

12   edits that are in place.

13        The problem with those claims, and claim 82,

14   is that they might have been involving double billing.

15   They might have involved billing involving skilled

16   nursing facilities and violating the consolidated

17   billing rules.  There might be other processing issues

18   that the computer system kicked out.  And when the

19   computer system kicks it out, it generates a letter to

20   the plaintiff to explain, you've been overpaid.  These

21   claims were paid before, but our system went back and

22   reviewed these claims and picked up these claims, and

23   we have overpaid you.  Therefore, you owe us money on

24   those 241 claims which equals $66,000.

25        Plaintiff, for whatever reason, never

1    appealed those initial determinations.  That period has
2    expired.  From the agency's perspective, that is
3    considered a final determination.  And I don't -- in my
4    view, I don't see what the Court could possibly review
5    from that, because from our perspective, it is a mature
6    debt in the amount of $66,000.
7            Claim 83, on the other hand, is a different
8    animal.  That claim is a result of this ongoing program
9    integrity review, which is being conducted by
10   AdvanceMed.  You might recall that name from the
11   pleadings.  But that is a Medicare contractor
12   specifically reviewing all the claims that have been
13   submitted by the plaintiff from January 1, 2011,
14   through the present.  It's that, what, three-year time
15   frame -- two and a half years -- my math is not adding
16   up -- but from January 1, 2011 through the present,
17   AdvanceMed had to break that down into four universes
18   to make them more manageable.
19            And what Ms. Fogg was explaining, that of
20   that claim 83, Universe 1 has been completed review
21   through acceptable sampling and testing methodologies
22   -- very, very thorough review -- and has been
23   determined that of those, I think 1,400 units that were
24   billed in that sampled universe, that these claims are
25   not covered.  There are many reasons --

1           THE COURT: 1,400 samples or 1,400 claims

2     within Universe 1?

3           MS. FREEMAN: 1,400 units. So in other

4     words, when the AdvanceMed takes their samples, they

5     will cull the number of beneficiaries -- that's the

6     starting point. They cull from that. What are the

7     dates of service for these particular beneficiaries,

8     and they pull out that.

9           With respect to plaintiff's claims, the

10     plaintiff billed numerous line items in one claim. And

11     within the line items, there could be several units.

12     So you might have one beneficiary, and there might be

13     five separate claims that were submitted for that

14     beneficiary. But within those five claims, you might

15     have 12 line items, meaning was there a test for

16     Plavix, was there a test for beta blockers, was there a

17     a test for Warfarin, and so forth and so forth. And

18     then, depending on how the plaintiff billed it, the

19     plaintiff might apply several units to apply to a line

20     item.

21           And I realize this gets complicated --

22           THE COURT: No, that's fine. I want to hear

23     this detail. Go ahead.

24           MS. FREEMAN: So therefore, for Universe 1,

25     there were approximately 1,400 units that were billed

1       by the plaintiff, and in reference to 50 claims with

2       260 service items within those claims.  So therefore,

3       when AdvanceMed conducted its review -- again, very

4       sophisticated and detailed statistical analysis -- it

5       then goes through the medical documentation to support

6       those claims and service items, if you will.

7             You asked what is involved in that review.

8       It requires a review to understand, well, what were the

9       diagnoses of these particular beneficiaries.  Because

10      Medicare will only cover genetic testing under very

11      specific, very limited circumstances.  Simply because a

12      laboratory calls something a genetic test and sends the

13      test to Medicare doesn't guarantee that it will be

14      covered.  Perhaps the system might pay out on that

15      claim because the system has to work so quickly to get

16      these claims dealt with.

17            But here, given the allegations of fraud that

18      were raised, Medicare and AdvanceMed said, we need to

19      go take a look at what's been going on here.  And

20      therefore, they go through the medical documentation to

21      understand, well, what kind of a genetic test was

22      applied?  What were the prescriptions that this

23      beneficiary supposedly was taking?  Because again,

24      Medicare has very specific line items insofar as what

25      kind of drugs can be tested for.

1          And then the medical review has to ask

2     itself, well, what were the diagnoses that were

3     supplied by the doctors?  In some instances, we found

4     that the plaintiff had preprinted the diagnosis codes

5     on the forms.  And that's a no-no in the Medicare

6     program.  It's the doctor who has to indicate what the

7     diagnosis is.  It's not up to a laboratory to decide

8     what the diagnosis is.  Everything stems from what a

9     physician supposedly orders.

10          The concern that's been raised here is that

11     the laboratory here has been pre-inserting information,

12     and in some cases, doctors didn't even sign off on a

13     requisition that would be given to the laboratory.

14     That would be another reason on which to deny a claim,

15     if there's no physician signature or if there's no

16     intent that a physician had actually ordered a test for

17     a particular purpose.  Medicare can deny the claim.

18          Those are only the regulatory criteria

19     regarding physician's signatures.  Did the physician

20     intend -- did a physician order the test, versus the

21     physician's secretary in the clinic?  There are very

22     specific regulatory criteria that apply to

23     laboratories, but then you add on top of that, very

24     specific coverage criteria that applies to genetic

25     testing in question.

1          To begin, as a general rule, Medicare does

2     not cover screening tests.  And that's what we're

3     finding with a lot of these -- well, so far, in

4     Universe 1, we have found that with 100 percent of the

5     claims that were reviewed, there was no diagnostic

6     testing.  Instead, either signatures didn't appear, or

7     diagnoses codes were not appropriate.  Whatever

8     diagnosis codes appeared on these preprinted forms that

9     were supplied by plaintiff, it did not match the actual

10    diagnosis of the patient itself.  Or there were -- if a

11    patient was on Warfarin, for example, there are very

12    specific circumstances under which Medicare would ever

13    pay.  For example, Medicare will only cover Warfarin

14    testing if a patient was on it for less than five days

15    and if the patient was involved in a clinical trial and

16    it was used in the active managed care of the patient.

17         AdvanceMed found these things weren't

18    happening with these patients.  And therefore, the

19    concern that it's caused us is that this is either

20    screening, Medicare screening -- which Medicare does

21    not cover -- or there's simply no supporting

22    documentation whatsoever.

23         THE COURT:  Screening meaning it isn't

24    specific to anything that's been diagnosed yet?

25         MS. FREEMAN:  That's correct.  For example,

1    Medicare would not cover a beneficiary who's curious to
2    know whether they might have a predisposition to a
3    certain sensitivity.  There has to be signs and
4    symptoms of a particular covered benefit.  I hope that
5    makes sense.
6              THE COURT:  Yes, it does make sense.  So for
7    instance, if a physician thought, well, maybe it would
8    be appropriate to prescribe X for this patient, but I'm
9    leery of doing that because it's a dangerous drug.  If
10   he or she has X indicators in their genetic makeup, we
11   better have some genetic testing for that.  Would that
12   be appropriate or not appropriate where they haven't
13   prescribe the drug yet?
14             MS. FREEMAN:  As a general rule, no, that
15   would not be covered by Medicare.
16             THE COURT:  Okay.  It may be medically a good
17   thing to do, but it wouldn't be covered by Medicare.
18             MS. FREEMAN:  Perhaps.  But what we found in
19   a lot of medical records we have been reviewing,
20   doctors didn't even review the results with their
21   patients.
22             THE COURT:  So for one of these enumerated
23   reasons, but not always the same reason, every single
24   one of these claims that was tested was bad.
25             MS. FREEMAN:  Correct.  Or we found that -- I

1      don't know if the word "bad" is the right word, but --

2             THE COURT:  Not covered for some reason.

3             MS. FREEMAN:  Not covered, not appropriate,

4      not reasonable and necessary.  All of those phrases

5      would apply to these claims.  And then to some extent,

6      there were signatures missing or preprinted diagnosis

7      codes.  That raises a real certain.

8             THE COURT:  Okay.  And then are some of the

9      those problems fixable, potentially?  If the office

10     assistant signed it when the doctor should have, but

11     the doctor fully would have prescribed that, is that a

12     fixable problem?  They just need more documentation?

13     Or is it too late, once it's --

14            MS. FREEMAN:  No.  Yeah, it would be

15     considered too late.  It is not fixable.  Because the

16     claim has to be -- it has to be reliable, and it has to

17     be honest when it goes into the system.  It has to have

18     some integrity underlying it so that it can be

19     supported by the medical document.

20            THE COURT:  So just from a -- regardless of

21     whether there was fraud involved, basically from an

22     incompetent standpoint in making Medicare claims, this

23     debtor, in Medicare's eyes, is as bad as it could be.

24            MS. FREEMAN:  Correct.

25            THE COURT:  All right.

1          MR. FREEDMAN:  Your Honor, this is Larry

2     Freedman.  Lots was covered there, but if I could just

3     make one simple point, responding to Ms. Freeman.

4     What's been reviewed by AdvanceMed was 30 patients, as

5     I understand it.  I read the report.  And about half --

6     and they asked for medical records from doctors to make

7     this review.  There is very little, if anything,

8     alleged that the lab didn't do correctly.  They looked

9     for medical records.  About half of these denials were

10    simply because doctors' offices themselves didn't

11    provide the records, and they didn't have, in their

12    view, documentation.

13         So there are -- all we want is to be able to

14    test this, understand the claims were proper or not, if

15    the lab did anything wrong or not, because of the

16    substantial amount of money at issue.  Your questions

17    were right.  What would this involve.  And there simply

18    isn't going to be another way to go through it, besides

19    to get the information from CMS and for us all to

20    figure out, through experts or other standard trial

21    processes or pretrial processes, how to figure out

22    these universes.

23         THE COURT:  All right.  Thank you.  Okay.  So

24    back to the motions.  I will try and rule on the two

25    stay motions as soon as I can.  It may take a little

1     longer on the abstention and the renewed motion for

2     dismissal on the pleadings.  I'm cognizant of the fact

3     that the rug could be totally pulled out from under me

4     and then may not even partially sent back down to me --

5     there's a range of options -- in the motion pending in

6     front of Judge Lasnik, including a second redundant

7     motion to dismiss in front of him.  So in some ways,

8     I'm not sure who's going to rule first.  It all might

9     get mooted.  But I will get to it as soon as I can.

10         But in the meantime, since I have not granted

11     any kind of stay, there is no stay in effect of

12     discovery.  So let me at least caution the parties of

13     that.  I will try and rule promptly.  And I'm not going

14     to make any predetermination of any non-compliance with

15     discovery requests as to what I would do with those if

16     they get back in front of me during this hiatus where I

17     haven't ruled on these latest motions for stay or for

18     protective order.  But I haven't ruled until I've

19     ruled.  So the normal discovery rules are still in

20     effect until I rule on either or both of those motions.

21         So again, I will let both sets of counsel

22     know as soon as I'm ready to rule on any of the four

23     motions.

24         Thank you.

25         MS. FOGG:  Thank you, Your Honor.

AHEARN & ASSOCIATES
ahearnandassoc@comcast.net